## J. J. LINK, Appellant, v. MONTRAVILLE HAMLIN, and MONTRAVILLE HAMLIN Doing Business as the AMERICAN MEDICAL JOURNAL.

### Division One, March 12, 1917.

1. **LIBEL:** Statute: Applicable to Civil Cases. The statute defining libel (Sec. 4818, R. S. 1909) is applicable in civil as well as in criminal cases.

2. ————: Pleading: Cause of Action. An article published in a medical journal charging that the virtue of a medical college "was sullied when an Allopath was placed on the faculty and permitted to purchase a block of its stock, and its final prostitution completed when that same Allopath secured by purchase a controlling interest;" that "this individual professed great love for Eclectic principles, was accepted into our Eclectic societies, and in every way inveigled himself into the good graces of Eclectics, with, we believe, the direct aim of destroying" the college "as an Eclectic institution;" that "this simply goes to show that you cannot change a wolf into a sheep, even if you do clothe him in a coat of wool;" and that "hence the inevitable has happened: the flock of sheep feels the fangs of the animal which could not be hidden for long," charged and was intended to charge that said "Allopath," by fraud, deceit and trickery, got possession of the college and by false representations and actions won the confidence of Eclectics, for the purpose of destroying said college as an Eclectic school; and a petition which sets forth such article, and then by apt allegations avers that it was written and published by defendant and that the charges were intended to charge plaintiff with those things and were false and maliciously made, states a cause of action.

3. ————: Demurrer to Evidence. In passing upon a demurrer to the evidence it is the duty of the court to draw every reasonable inference from the facts proven that a jury might draw, were the case submitted to them. And where the petition states a cause of action for libel, the publication contains libelous charges and is shown to have been made by defendant, and its charges shown to be false, no demurrer to the evidence should be sustained.

4. ————: Privilege: Malice: Proof. An assumption as true in editorial comment on a publication known to be false, shows malice. Where there is substantial testimony tending to show that the publication was libelous, that it was untrue and known to be false when published, and that after it was published or along with its publication editorials relating to the same subject and assuming it to be true were also published, the communication is not privileged, but sufficient malice is shown to carry the case to the jury.

Appeal from St. Louis City Circuit Court.—*Hon. James E. Withrow*, Judge.

REVERSED (*with directions*).

*Frank A. Habig* for appellant.

(1) It was conceded by the trial court that the article published of and concerning plaintiff by the defendant was a libel *per se*. Sec. 4818, R. S. 1909; Kenworthy v. Journal Co., 117 Mo. App. 335. Words which on the face of them, when falsely published of a party, in connection with his trade or profession, which must necessarily injure him in respect thereto or which directly tend to the prejudice of such person in his trade or profession, are actionable in themselves without proof of damages. St James v. Gaiser, 125 Mo. 527; McGinnis v. Knapp & Co., 109 Mo. 143; Ukman v. Daily Record Co., 189 Mo. 392; Price v. Whitley, 50 Mo. 439; State v. Powell, 66 Mo. App. 613; Finley v. Steele, 159 Mo. 304; Farley v. Pub. Co., 113 Mo. App. 224; Sullivan v. Commission Co., 152 Mo. 268; Cook v. Globe, 227 Mo. 534; Cook v. Pub. Co., 241 Mo. 362; Minter v. Bradstreet Co., 174 Mo. 486. (2) The trial court required of plaintiff that he prove not only that the article was false, but that he also prove express malice. It was held in Cook v. Globe Ptg. Co., 227 Mo. 531, that "the falsity of all defamatory words is presumed in plaintiff's favor, and he need give no evidence to show them false." See also Nelson v. Wallace, 48 Mo. App. 198; Minter v. Bradstreet Co., 174 Mo. 486. The case of Cook v. Pub. Co., 241 Mo. 362, holds that "proof of the falsity of the facts alone is all that a plaintiff is required to prove and that it is not necessary in addition that the plaintiff should also prove that the publication was inspired by actual malice." See, also Cornelius v. Cornelius, 233 Mo. 35. (3) Upon proof of the falsity of the words published, malice is presumed. Academy v. Gaiser, 125 Mo. 527; Mitchell v. Bradstreet Co., 116 Mo. 226.

*Roy Hamlin* and *Hamlin, Collins & Hamlin* for respondents.

(1) The article was a qualified privileged communication, and being so, the court did right in directing a verdict for the defendants and in support of both propositions we submit that the case of Holmes v. Royal Fraternal Union, 222 Mo. 556, is ample authority, together with the cases therein cited. See also Finley v. Steele, 159 Mo. 299. The trial court after having heard the evidence offered by the plaintiff found that plaintiff had failed to prove actual or express malice, and found rightly that the article was published by the defendants, honestly believing that the statements made therein were true, or, that they had reasonable cause to believe they were true, and with no motive of malice. In doing so it followed the rule in such cases in this State. Cornelius v. Cornelius, 233 Mo. 1; Cook v. Pub. Co., 241 Mo. 326. In such cases the onus of proving express malice and falsity rests upon the plaintiff. Cook v. Pub. Co., supra. (2) The petition does not state a cause of action. The article published was not libelous *per se,* and the language used in same should not be construed as libelous. The language when considered in its ordinary sense simply says that the owner, by reason of his authority, converted the American Medical College into an Allopathic from an Eclectic School, thereby as considered from an Eclectic standpoint, a step backward or retrograding. Diener v. Chronicle Pub. Co., 230 Mo. 625; Baldwin v. Walser, 41 Mo. App. 243; Spurlock v. Investment Co., 59 Mo. App. 225.

RAILEY, C.—On August 20, 1910, plaintiff commenced an action in the St. Louis Circuit Court, against said defendants, to recover damages arising out of the publication of a certain alleged libelous article in the American Medical Journal.

The amended petition alleges that defendant Hamlin was publishing the above monthly journal, in St. Louis, Missouri; that it has a large circulation in said city, throughout the State of Missouri, and many other States,

as well as the cities therein; that the July number for 1910 was largely circulated as above stated. He alleges that there was printed and published in the July issue aforesaid, in volume 38, number 7, signed by Stephens, defendant herein, the following defamatory and libelous article, of, and concerning plaintiff, to-wit:

"The Rape of the American Medical College.

"We want to caution all our Eclectic friends, that the American Medical College has been raped; that it has been prostituted to allopathy and therefore is no more an eclectic institution. Early in June of this year it was declared, by its OWNER, a regular college and so published in the daily papers.

"The virtue of the college was sullied nine years ago when an allopath was placed on the faculty and permitted to purchase a block of stock, and its final prostitution completed when that same allopath secured, by purchase, a controlling interest. The act of harlotry was finally accomplished in June, 1910. This individual professed great love for Eclectic Principles; was accepted into our Eclectic Societies and in every way inveigled himself into the good graces of Eclectics with, we believe, the direct aim of destroying the American as an Eclectic institution. This simply goes to show that you cannot change a wolf into a sheep, even if you do clothe him in a coat of wool. Hence the inevitable has happened. The flock of sheep feels the fangs of the animal which could not be hidden for long. So we warn you, our friends, to look to it that no Eclectic student enters the poisoned atmosphere of this institution. The American has no standing, having been condemned by the American Medical Association as incompetent, and it is no longer a member of the Confederation of Eclectic Colleges. Its diplomas were refused recognition by the Illinois board at the close of the last session because of meager equipment. From this it is evident its graduates can have no standing professionally. The institution has no future and its death is only deferred for a very short time. In the very nature of things it must draw its students from the allopathic ranks, and we ask in all seriousness, what fool would jeop-

ardize his future professional career by graduating from a one-man allopathic college without a single feature to recommend it? What kind of a young man would he be who would pass the Washington University and the St. Louis University by as allopathic institutions, and attend an insignificant college standing in their shadow and but poorly manned with instructors? God pity the people who employ such a man, a man whose lack of judgment would induce him to take such a course. Decidedly, the place for such a man is in the insane asylum. There is no excuse of a small college at the present time except as an Eclectic or Homeopathic institution.

"We want our readers to know that every Eclectic who held a chair in the faculty of the American while it yet retained a semblance of Eclecticism, quit the institution at once when the rape took place, for none of them was a party to the act of prostitution. These are now banded together and are all working harmoniously to establish a new Eclectic Medical College in St. Louis, ready for instruction in September, where Eclecticism will be taught and where its principles will remain forever supreme. And the first scoundrel who shows his flat head will receive a rap that will deter him from committing an offense such as has been done the American. Professional sneaks will be dealt with according to their deserts henceforth.

"We also want to warn you that a concerted movement is going forward all along the line to destroy us as a school (of which we believe the course of the American Medical College forms a part) and you who think you are loved to death by this tribe of bigoted rascals, know, that they only lick you preparatory to making a meal of you. Be warned in time for the American Medical Association, backed by the moneyed interests of this country are doing all in their power to crush everybody but themselves, as is shown by the many obnoxious bills introduced into Congress the past session. Therefore, look to your own interests and keep clear of all connections with those who would destroy you without compunction,

for 'they come as a thief in the night' to rob you of your inheritance.

"We are fighting the same old fight our fathers fought, and the battle ahead of us is as great as they ever fought because, while they were ever awake to the dangers that lurked on every hand, we have been lured into a dangerous lethargy by blandishments and ostensible good will.

"We would be glad to have a letter, good and strong, from every Eclectic who may read this as a token of alertness and in evidence of good will. Remember we are working for you as for ourselves, and our fight is your fight. Let us then stand shoulder to shoulder against the common enemy; shoulder to shoulder for freedom in medical practice; and if we thus stand together, there is no power on earth, nor in hell where all oppression springs from, that can destroy us. If we do not, the sun of Eclecticism will forever set, and that in this generation.

"Let us work then as brothers in a good cause and give of our time and money when necessary and all will be well.

"STEPHENS."

Plaintiff alleges that he is the "owner and allopath" referred to in said article; that defendants meant and intended to charge therein, and its readers understood he was being charged with having, by fraud, deceit and trickery, gotten possession of said college, and by false and fraudulent representations, statements, and actions won the confidence of defendants and others, and especially stockholders and members of said American Medical College, with the direct aim and for the purpose of getting possession of said college and destroying the same as an eclectic institution; and that plaintiff was a wolf in sheep's clothes, ready to destroy, and a person to be avoided; that he was a "flat headed scoundrel;" that he was a professional sneak;" that he was one of the "tribe of bigoted rascals;" that they "only lick you preparatory to making a meal of you;" meaning and inferring that plaintiff would practice deceit and trickery to gain your confidence,

and then destroy a person of their rights; and that he was meant to represent "a thief in the night," to rob and steal from eclectics and others their rights. The petition then denies the truth of said allegations, insinuations and innuendoes. It is averred that said charges were wilfully, wantonly and maliciously made by defendants concerning plaintiff; that they were false and known to be so, when published by defendants; that they were designed to deprive plaintiff of public confidence, and to expose him to public hatred, contempt and ridicule, and to deprive him of the social intercourse of the physicians and medical men, as well as all other persons, where said journal circulated, and thereby injure plaintiff in his business and profession of physician and surgeon, and as president of said American Medical College, president of the American Hospital and president of the Association Hospital, all of the city of St. Louis, Missouri.

Plaintiff sued for $5000 as actual and $10,000 as punitive damages.

On February 26, 1913, plaintiff dismissed as to Stephens.

Defendant Hamlin filed an amended answer to the amended petition, and admitted the truth of certain facts as follows: That defendant is the owner of the American Medical Journal, published in St. Louis, the same having a circulation in said city, the State of Missouri, as well as in many other cities and states throughout the United States; that in the July issue of the American Medical Journal there appeared an article signed "Stephens" substantially in manner and form, as set forth in petition. He admits that J. J. Link is the owner and allopath referred to in said article. He denies every other allegation in the petition.

The answer avers that plaintiff, a graduate of the regular school of medicine, on his application, joined several societies of Eclecticism; that he obtained forty-eight shares of stock, out of one thousand, in the American Medical College; that he continued thereafter a member of the faculty of said college, *and until* 1910, *"continued to teach the principles of Eclectic medicine and*

*surgery therein;"*, that he acquired a majority of the stock of said college, and in June, 1910, had the following resolution passed by the board of directors of said college, to-wit:

"Whereas, sectarianism is not in accord with the spirit of the times, be it resolved that the American Medical College is and shall be a Regular School of Medicine."

There is but little, if any, controversy over the foregoing facts.

The answer further alleges, that the St. Louis Globe-Democrat, on its first page, in large letter-heads, contained the following:

"Eclectic School Shifts. The American Medical College Converted Into an Allopathic Institution." That a picture of Dr. James M. Ball appeared on the same page of said paper, and was referred to as follows:

"Dean of the School that joins Allopathic ranks."

Defendant alleges that soon after said college was organized, he became the dean thereof, and continued for many years to teach therein; that after plaintiff secured control of a majority of the stock of said college and was then able to dictate its policy, he became convinced that "plaintiff was not at heart an Eclectic, and he, therefore, resigned his position as dean of said college."

He alleges, that on account of said change in the college and the publication aforesaid, it would be readily inferred that the change was made because the college board believed they had been in error in teaching the principles of Eclecticism, and that the change was made to correct this error; that, inspired by a desire to publish the truth, on account of the matters aforesaid, he caused the publication of the article set out in the petition, in order to warn the friends of Eclecticism that said change was brought about *solely* on account of plaintiff having acquired a majority of the stock of said college. He denies in the answer, that said article was intended to charge that plaintiff was a *"wolf in sheep's clothing,"* or that he was a *"flat headed scoundrel,"* or *"professional sneak,"* or that he was one of a tribe of "bigoted rascals" that lick you only preparatory to making a meal of you, as charged

in plaintiff's petition. He alleges that said article did not refer to "plaintiff's professional or social standing," or was so understood by the readers of said article, but that said publication, "in all its intent and innuendo was directed wholly to his acts and conduct in connection with the said American Medical College, and the fact that he had, by professing to be in love with Eclectic principles, by joining the societies of Eclectics, by accepting a position on the faculty of an old and well-known Eclectic College, and teaching said principles of Eclecticism therein, succeeding in inveigling himself into the good graces of Eclectics, whereby he was permitted to purchase stock in said college, and finally to acquire the entire control thereof, and to the fact that after he had acquired the control of said college, he converted it into a regular school, and advertised the same to the world at large in such manner that physicians and surgeons generally were wont to believe that said old and renowned Eclectic college had shifted to Allopathy (i. e., the regular school) because Sectarianism (i. e., Eclecticism) was no longer in accord with the spirit of the times."

The answer further alleges, that defendant was informed by plaintiff's counsel that his client felt that said artice reflected on his integrity and character and demanded a retraction; that defendant then published in the August issue of the American Medical Journal, the following:

"Ours is an Eclectic Journal; it fights the battles of Eclecticism, and will continue its course in the future as in the past, as the editor's judgment dictates. . . . We were convinced four years ago what Link's idea was as to the future of the college. In all that we have said, we have scrupulously avoided saying anything derogatory to Dr. Link's personal character, or his professional ability, but we have only referred to his acts as they relate to the American Medical College."

Defendant's answer alleges that in said August issue of the Journal he referred to the article complained of, published in the July issue, and said he did not intend to cast any aspersion on the personal character or profes-

sional ability of any man, but was referring to the change in said college as aforesaid.

The concluding paragraph of said answer alleges that the article complained of, was not published wantonly or from malice toward the plaintiff, but solely in the interest of truth and justice; that the same was a privileged publication in the interests of truth and justice; that "any and all language therein contained, which, by its form, meaning or innuendo, charges that the plaintiff by deceitfully representing that he was an Eclectic inveigled himself into the good graces of Eclectics, and thereby was permitted to acquire stock in said college, if any, is true, and this defendant honestly believed as herein stated that the direct aim of the plaintiff in so doing was to destroy the American Medical College as an Eclectic institution, and that the plaintiff is not entitled to the relief prayed for in his petition," etc.

The reply *admits* the publication of the libelous article complained of; that plaintiff, J. J. Link, is the person referred to in said publication; that the American Medical College, is a corporation, duly organized under the laws of Missouri; that at one time said college taught the Eclectic system of medicine; admits that the system of teaching was changed in June, 1910; that he was a graduate of the regular school of medicine; that he was requested by the propr officers of said college to act, and was appointed to lecture on operative surgery in said college; that he subsequently joined the various Eclectic medical societies; *admits that he believed in certain principles of the so-called Eclecticism;* that he purchased capital stock of said college, and finally did acquire a majority of said stock, but denies that by any false representation, or by any form of trickery or deceit, or otherwise, than by fair and honest bargain, he obtained said stock of said college; and further admits that proper notice was given to the public through the press and otherwise, of the change of the policy of the said school in its teaching. After setting out certain correspondence and publications referred to, the reply denied all the other allegations of said answer. It set out fully the facts which made it

necessary to change said college from an Eclectic to the regular school, and as tending to show that defendant's allegations in respect to said matter were untrue.

On February 28, 1913, a jury returned a verdict in favor of plaintiff for $1,500 actual and $880 punitive damages. Defendant's motion for a new trial was sustained, and the cause tried anew on January 7, 1914.

Defendant's counsel objected to the introduction of any evidence at the trial of this case, because the petition did not state a cause of action, and said:

"There is but one substantial statement of fact made in the article, viz: 'This individual' (referring to the plaintiff) 'professed great love for Eclectic principles; was accepted into our Eclectic societies and in every way inveigled himself into the good graces of Eclectics with, we believe, the direct aim of destroying the American as an Eclectic institution,' . . . and the only thing charged against the plaintiff is *that he fooled them into thinking he was an Eclectic when he was an Allopath that got into their society and stole their college.*"

It was conceded by defendant, that plaintiff, J. J. Link, was employed regularly to lecture at said college; that the latter was incorporated under the laws of Missouri, with a capital stock of $10,000, divided into a thousand shares at ten dollars each; that plaintiff was connected with the college in June, 1910, as professor of clinical surgery, and that he was also treasurer of said college; that at a meeting of the stockholders on June 6, 1910, the course of teaching in said college was changed from the Eclectic to the regular or Allopathic school.

Plaintiff was sworn as a witness, and testified that he resided in St. Louis, Missouri; that he was a surgeon and graduate of Northwestern University Medical School, which teaches the regular or Allopathic school of medicine; that he was an Allopath and graduated in 1890; that he had been connected with the American Medical College since 1902; that it was known as an Eclectic school; that he became connected with it at the suggestion of Dr. C. P. Clayburg, who became dean of the school after that. Plaintiff identified and read in evidence, the

article complained of, entitled, "The Rape of the American Medical College." He read in evidence an article published in the same edition of defendant's Medical Journal, which sets out the heading under which the college was advertised after the above change. Among other things, it contains the following:

."More than four years ago a certain allopath, named J. J. Link, conceived the idea of wresting the control of the college from our hands, and through the connivance of certain traitors to our cause, he succeeded.".

He read in evidence an article published in defendant's journal, of date June 10, 1910, headed, "Link had a Meeting," in which the meeting changing the teaching of the college was criticised and the appellant subjected to public ridicule. He also read in evidence another article published in defendant's Journal, of the same issue as the above, which reads as follows:

"Will the graduates of the Old American Medical College be satisfied to let their Alma Mater die? *or, what is worse than death, pass into the hands of this Allopath, who practiced every known deception to accomplish his design—even to joining all our societies and declaring himself as* good an Eclectic as the editor of this Journal? . . . Four years ago this month we sounded the alarm. When J. J. Link managed to get control of a majority of the stock of the American Medical College we promptly resigned both the deanship and our chair in the college, stating that we could not, nor would not submit to the dictation of an Allopath. . . .

"We are not a prophet, nor the son of a prophet, but after an *intimate* association with this man Link for four years we were in a position to know our man; and it now developes that we *did know him*." (Italics are ours).

Thereupon, the court ruled that plaintiff would be required, by his first witness, to prove not only the falsity of the article complained of, but also that it was *inspired by express malice.*

Plaintiff testified that he bought the stock of said college from other members of the faculty; *that he used no deception of any kind in acquiring same; that he did*

*not, with any false design, attempt in any way to destroy said college, as an Eclectic school; that he did not state to any member of the college that he was an Eclectic; that he never, at any time, stated to any of them that he was not a member of the regular school; that he never, at any time, stated to anybody that he, at any time, changed his system of thought.* Plaintiff further testified that, at date of trial, he was professor of surgery and head of the department of the National University, which was then the American Medical College; that he was also on the board of the University.

Upon cross-examination, plaintiff testified that he was a graduate of the Northwestern Medical School, which is known as a regular or Allopathic school; that he had always practiced medicine as such; that prior to his connection with the American Medical ·College he was professor of physiology, chemistry and hygiene in the regular school of physicians and surgeons. He testified, that· "Eclecticism" means, *"Choose that which is the best;"* that the regulars always practiced it; that he had always practiced it and meant to practice it; that the American was known as an Eclectic school; *that he had always approved of · Eclecticism in its full sense;* that it was all right and that they had always practiced Eclecticism when they chose it, being the best for the patient. *He testified that Doctor Hamlin asked him to buy the stock; that there was no difference between the schools in the teaching of surgery;* that he talked with defendant before coming into the college, but did not mention his ideas as to Eclecticism; that he did not speak of Eclecticism to any one; that Dr. Younkin asked him to come in and take his chair in surgery and that *Dr. Hamlin asked him to come in as teacher of anatomy; that these doctors were members of the faculty and on the board of trustees;* that he purchased some stock in 1903, *and that when he came to the college, the members of the faculty knew he had graduated and that his name had been in the directory as a regular practitioner;* that he had joined the Eclectic society about six months or.a

year after he became connected with the college; that while connected with the college he wrote papers on surgery before Eclectic societies; that he belonged to the St. Louis Medical Association, which was the regular school; that he did not retire from said association when he joined the Eclectics; that he belonged to both societies at the same time, and that a good many other doctors do the same; that a good many doctors of the Eclectic society had asked him if he belonged to the regular or Allopathic society, at the time he joined the American College, and he told them he did; *that Dr. Clayburg and Dr. Hamlin had also asked him; that there was no secret about it;* that Dr. Hamlin had a directory in the library which stated that plaintiff belonged to both societies; that at the time he joined the societies, it was not contrary to the ethics of the Eclectic society to belong to both; but it is now contrary to the ethics of the Allopathic society to join both. He testified that Dr. Hamlin owned 380 shares of stock; *that the only purpose he (plaintiff) had in buying the stock was because Doctors Clayburg, Helbing and Hamlin urged him to buy it; that he was heartily in sympathy with Eclectic principles and that he never discussed the question of his loyalty to Eclectic principles with anybody.* Plaintiff testified *that he offered to sell his stock to members of the Eclectic societies and college, at what it cost him and without interest; that he offered to sell on time and could find no purchasers;* that he offered to sell his stock to Eclectics at par, which was less than it cost him.

Plaintiff was cross-examined as to an editorial in the "Medical Harbinger" written by Dr. Tucker, in which it was recited that Doctors Hamlin and March, editors of the American Medical Journal and Medical Arena, put forth an effort at Kansas City to combine said journals and make it the organ of Eclecticism, and that their proposition was voted down. Plaintiff further testified that some of the Eclectics were not agreeable; that there was factional trouble among them; that he tried to bring them together; that the Eclectics did not

support Dr. Younkin in the matter; that he also learned there was a movement on foot to establish a new Eclectic college in St. Louis; that he knew if one could not pay, two could not; that he called the representative Eclectics together at a meeting and offered them the whole college at their own terms; that they refused said offer and gave no reason therefor.

Dr. Snow corroborated plaintiff in respect to offering his stock at par and giving the purchasers their own terms. This was in May, 1910, before the change in June of same year.

Plaintiff testified as to the worry and depression said articles caused him, and likewise testified as to his loss of business, etc.

At the conclusion of the above testimony, the court, during the argument on a demurrer to the evidence, stated that in his opinion no *malice* was shown and thereupon gave a peremptory instruction to the jury to return a verdict in favor of defendant. The plaintiff took an involuntary nonsuit, with leave, etc. Appellant in due time filed his motion to set aside said nonsuit and for a new trial, which was overruled, and the cause was duly appealed by him to this court.

It is insisted by respondent that plaintiff's petition fails to state facts sufficient to constitute a cause of action. He likewise contends that plaintiff's evidence was insufficient to warrant the trial court in submitting the case to the jury. The lower court overruled the first contention, but at the conclusion of plaintiff's case directed a verdict in behalf of defendant.

In order to pass upon both questions intelligently, we have substantially set out the pleadings; the article complained of in petition, and the evidence introduced in behalf of plaintiff.

I. Does the amended petition state a good cause of action against defendant? Section 4818, Revised Statutes 1909, defining libel, reads as follows:

"A libel is the malicious defamation of a person made public by any printing, writing, sign, picture, representation or effigy tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse."

<span style="float:left">Cause of Action.</span>

In passing upon the sufficiency of the petition it becomes our duty to consider the same on the theory that all the facts well pleaded therein, are to be taken as true. Among other things the article complained of states that:

"The virtue of the college was sullied nine years ago when an allopath was placed on the faculty and permitted to purchase a block of stock, and its final prostitution completed when that same allopath secured by purchase a controlling interest. The act of harlotry was finally accomplished in June, 1910. *This individual professed great love for Eclectic Principles; was accepted into our Eclectic Societies and in every way inveigled himself into the good graces of Eclectics with, we believe, the direct aim of destroying the American as an Eclectic institution.* This simply goes to show that you cannot change a *wolf* into a sheep, even if you do clothe him in a coat of wool. Hence the inevitable has happened. The flock of sheep feels the fangs of the *animal* which could not be hidden for long." (Italics are ours).

The plain import of the above language was to charge—and intended by defendant to charge—that plaintiff, by fraud, deceit and trickery, got possession of the American Medical College and by false and fraudulent representations, statements and actions, won the confidence of defendant and others, and especially with the direct aim, and for the purpose of obtaining possession of said American Medical College, and destroying the same as an Eclectic institution. It is further charged by innuendo, that plaintiff, in accomplishing said alleged purpose, was a *wolf* and *animal*. It is averred in the petition that the readers of said Journal construed said language as above indicated; that the statements afore-

said were false, and known by defendant to be false when made; that they were wantonly, wilfully and maliciously made to injure plaintiff, etc.

We are of the opinion that a cause of action is stated; that the allegations of the petition bring the case within the purview of section 4818, Revised Statutes 1909, supra, and that said section is applicable in civil as well as criminal cases. [Sotham v. Telegram Co., 239 Mo. l. c. 619; Wright v. Great Northern Ry. Co., 186 S. W. l. c. (Mo. App.) 1088.]

II. Was the trial court justified in directing a verdict for defendant? In passing upon the demurrer to the evidence, it devolves upon us to draw every reasonable inference from the facts proven, which a jury might have drawn, had the case been submitted for their consideration. The testimony shows that the charges made in the publication under consideration, in so far as they relate to any alleged improper conduct upon the part of plaintiff, are shown to be false. The jury would have been justified under the evidence, in finding that plaintiff had been guilty of no impropriety in respect to all of his dealings relating to the American Medical Society. We rule that the evidence was sufficient to warrant the jury in finding that the matters contained in said publication constituted a *libel* against appellant. The evidence heretofore set out, as well as other testimony not mentioned, was clearly sufficient, in our opinion, to warrant the jury in finding, not only that defendant had libeled plaintiff in the publication of said article, but that the same, in connection with the subsequent utterances of defendant, indicated *malice* upon his part against the plaintiff in the publication of said article.

The court below, therefore, committed reversible error in directing a verdict in behalf of defendant.

III. Counsel for respondent contend that the article complained of was a privileged publication; and that plaintiff's case should fail, because he failed to prove

*malice.* Cornelius v. Cornelius, 233 Mo. 1, and Cook v.
Publishing Co., 241 Mo. 326, l. c. 359, are cited
Privilege. in support of above contention. While defend-
ant claims in his *answer* that he represented Eclectics in
the publication of said article, and that by reason there-
of it was privileged, yet no proof was offered in support
of this contention. On the contrary, the only testimony
in the case relating to this subject, is found in the letter
of Dr. C. A. Tucker to the editor of the Medical Har-
binger, read in evidence by defendant, and in which he
says:

"Do you remember anything about an effort put
forth at our state meeting in Kansas City last June by
Drs. Hamlin and March, editors of the American Medi-
cal Journal and Medical Arena, to combine the Eclectic
Journals of our State and make it the organ of Eclec-
ticism of our state society?' Do you, who were there, re-
member how we voted that proposition down?"

In the very able and carefully considered opinion of
Judge KENNISH, in Cook v. Publishing Co., 241 Mo. l. c.
362-3, relied on by respondent, a marked distinction was
drawn between *privileged communications* and *privileged
comment,* as follows:

"It will be noted that under the rule of the authori-
ties last cited the defense of privileged comment fails
upon proof of the falsity of the facts alone, and it is not
necessary that the plaintiff should prove in addition
thereto that the publication was inspired by actual
malice, as in the case of a defense of privileged commu-
nication. It should be observed further that under all
the rules stated, proof of the falsity of the facts and
knowledge of such falsity is proof of actual malice.

"We think there is good reason for recognizing the
distinction thus made between the law applicable to the
defense of privileged communications and that of priv-
ileged comment, making the privilege broader in the for-
mer than in the latter. In the former the communication
is usually made under a sense of duty and to one person
or a limited number of persons. The privilege of com-
ment, on the other hand, while of the highest importance

to the public welfare, is not made under a sense of duty, but is purely voluntary, and when the unlimited extent of the publication and the consequent injury to the complainant is considered, it would, in our opinion, be a most dangerous doctrine to require the plaintiff, in order to make a prima-facie case, to prove not only that the facts were false, but also that the defendant was actuated by express malice.

"We think the rule to be deduced from the authorities and in accord with the better reason, is that when a defense of privileged comment on a matter of public interest is presented by the issues, the plaintiff may overcome the privilege pleaded either by proof that the publication was inspired by actual malice, or that the facts published and commented upon were false."

Plaintiff's testimony is uncontradicted and in clear language refutes the truth of the libelous matter complained of in said publication. In Cornelius v. Cornelius, 233 Mo. l. c. 31, Judge LAMM, quotes with approval from the opinion of Judge PAXSON, in Briggs v. Garrett, 111 Pa. St. l. c. 414, as follows:

"A lie is never privileged. It always has malice coiled up within it. When a man coins and utters a lie, or when he repeats it knowing it to be false, the law implies malice, and he cannot shelter himself behind the doctrine of privileged communications."

There is no testimony in the record which warranted the court in disposing of plaintiff's case as a matter of law. The jury had before them substantial evidence tending to show that said article was libelous; that it was untrue and known to be so when published; and that the publication of the same with the supplemental and repeated comments of defendant relating to the same subject, were inspired by malice.

IV. The question as to what elements of damage may be considered, if plaintiff is entitled to recover under the pleadings, need not be considered now, as the case will have to be re-tried, and this question may not arise again.

Damages.

We accordingly reverse the case, with directions to the trial court to set aside its judgment herein and to proceed with the trial of the case in conformity to the views here expressed.

*Brown, C.,* concurs.

PER CURIAM:—The foregoing opinion of RAILEY, C., is hereby adopted as the opinion of the court. All the judge concurs.