OPINION OF THE COURT
Nicholas V. Midey, Jr., J.
*163 In this claim, claimant seeks damages from the State resulting from her prosecution, conviction and sentencing, and the subsequent vacatur of her conviction and dismissal of the indictment against her, for certain crimes arising from a quadruple homicide which occurred in December 1989, in Dryden, New York.
Claimant had originally set forth numerous causes of action in her claim against the State. In response to a dismissal motion brought by the defendant, this court, by an order filed February 17, 1999 (see order to motion No. M-56122), dismissed several of those causes of action upon various grounds, and retained three causes of action, to wit: (1) unjust conviction premised upon Court of Claims Act § 8-b, (2) malicious prosecution, and (3) negligent hiring, training and supervision.
Following completion of discovery, the parties separately moved for summary judgment on the issue of liability. In a decision and order dated September 29, 2004,[1] this court dismissed the unjust conviction claim under Court of Claims Act § 8-b. Furthermore, at the outset of trial, the parties stipulated that the cause of action based upon negligent hiring, training and supervision was limited solely to the issue of negligent supervision.
Accordingly, this decision will address the remaining two causes of action, to wit: (1) malicious prosecution, and (2) negligent supervision. Since the trial of this claim was bifurcated, this decision deals solely with the issue of liability on each cause of action.
Background
On the morning of December 23, 1989, New York State Police Trooper John J. Beno responded to the report of an alarm sounding at a residence located at 1886 Ellis Hollow Road in the Town of Dryden, Tompkins County. When he arrived at the premises at approximately 7:20 a.m., Trooper Beno observed one set of vehicle tracks in freshly fallen snow, leading away from the garage and across the lawn. After examining the exterior of the premises, and receiving no response when he rang the doorbell, Trooper Beno entered through a garage door and encountered a house full of smoke. He immediately radioed his barracks, requesting assistance.
*164 As he continued his search of the house, Trooper Beno located a burned body in the master bedroom. Shortly thereafter, officers and firefighters discovered three additional bodies in another upstairs bedroom.
Ultimately, it was determined that the body in the master bedroom was that of 15-year-old Shelby Harris, and the other burned bodies were those of her parents, Warren and Dolores Harris, and her younger brother Marc. It was later determined that all four victims died as the result of gunshot wounds, and that Shelby Harris had been sexually assaulted.
A massive manhunt immediately ensued with more than 50 investigators eventually assigned to this investigation. Several objects were recovered from the crime scene, including a metal gas can. Law enforcement officials theorized that following the murders of the Harris family, the murderer or murderers set fire to the house in an attempt to destroy any evidence. Investigators suspected that gasoline from this can had been used as an accelerant, and therefore the can was inspected and tested in attempts to obtain fingerprints, which might lead to the identification of a suspect or suspects.
Later that morning, the Harris family van was located in a bank parking lot at East Hill Plaza, approximately five miles west from the Harris home. Based on this discovery, investigators believed that this van had been used as the getaway vehicle after fires were set[2] in the Harris home. Three days later, State Police received information that an attempt had been made to withdraw cash at various ATM machines in Tompkins County using bank cards belonging to the Harrises. State Police also learned that credit cards in the name of the Harrises were used for purchases at different shopping malls in Cayuga and Onondaga Counties, and that these transactions had all occurred on December 23, 1989. Based upon information provided by witnesses, the State Police prepared composite sketches of two individuals who were seen using these cards, a young adult black man and a middle-aged black woman. Within several days, these composite sketches were distributed to the media in hopes of generating potential leads in identifying the suspects.
Among the many calls and leads received from the public, the State Police obtained a sworn statement from H. Dean Sutphin, a professor at Cornell University who at the time resided on El *165 lis Hollow Road, approximately 3.9 miles west from the Harris home (and one mile east of the parking lot where the Harris van had been found following the homicides). In a statement given to the State Police on January 8, 1990, Mr. Sutphin stated that on December 23, 1989, at approximately 6:50 a.m., he was exiting his driveway when he saw a slow-moving van approaching his driveway from the east. Mr. Sutphin identified the driver of this van as a light-skinned black male wearing a stocking cap, and further stated that he was accompanied by a female passenger, also light-skinned but darker than the driver, who appeared older than the driver. He indicated that his description of the occupants of the van matched the composite sketches of the suspects which had been publicized by the news media.
The police also received several calls identifying Shirley Kinge, the claimant herein, as a person who fit the description of the woman who had used a credit card belonging to Dolores Harris. The State Police therefore began to focus on claimant as a potential suspect. During the course of their investigation, State Police learned that claimant had an adult son, Michael Kinge, and also that she was employed at the Peregrine House, a bed and breakfast in the City of Ithaca. On January 30, 1990, David Harding, an investigator with the State Police and a member of the Bureau of Criminal Investigations Identification Unit, went undercover by posing as a guest at the Peregrine House, where he was able to meet with Shirley Kinge.
A short time later, on February 3, 1990, Investigator Harding advised Senior Investigators David McElligott and H. Karl Chandler that he had matched claimant’s fingerprints to two latent fingerprints that he had lifted from the metal gas can found at the murder scene.
Also on February 3, 1990, Professor Sutphin met with Senior Investigator Chandler to revise his sworn statement with regard to his sighting of the van on December 23rd. Although he remained convinced that he had observed a van that morning, he now believed that his sighting might have occurred at a somewhat later time, possibly between 7:10 a.m. and 7:30 a.m. Additionally, after reconsideration, Professor Sutphin could no longer definitively state that he actually saw the particular occupants (a black man and older black woman) in the van on that date, as he had previously stated.
Based upon available evidence, a search warrant was obtained, authorizing a search of the duplex property at 520 Etna Road, Dryden, New York, where Michael Kinge and Shirley Kinge *166 both resided. At the time, claimant and her mother resided on one side of this duplex, and Michael Kinge resided in the other half of the residence with his girlfriend, Joanna White, and their child. As law enforcement officials attempted to search the premises and arrest Michael Kinge that morning, he confronted officers with a loaded weapon, gunfire was exchanged, and Michael Kinge died from gunshot wounds that he received during this, confrontation.
Claimant was taken into custody at this time, however, and was interrogated for approximately seven hours by Senior Investigator Chandler. She was eventually indicted on numerous criminal charges and, in November 1990, following a jury trial, was convicted of burglary first degree, arson third degree, forgery second degree, hindering prosecution first degree, hindering prosecution second degree, and criminal possession of stolen property. On January 30, 1991, she was sentenced to serve 18 to 44 years in prison.
In early 1991, during an employment interview with the Central Intelligence Agency, David Harding admitted that he had fabricated fingerprint evidence and committed perjury during a homicide investigation. This information was eventually forwarded to the State Police, and in 1992, it was revealed that Harding had fabricated evidence and provided false testimony during the criminal proceedings against claimant. It was also disclosed that Harding, as well as other members of the New York State Police, had fabricated evidence in other State Police criminal investigations as well. Specifically, with regard to the proceedings against claimant, it was determined that Investigator Harding had falsely testified with regard to the two latent prints that he had supposedly lifted from the gas can which had been found in the Harris home. As it turned out, claimant’s fingerprints had not been found on the gas can, his testimony was completely false, and the fingerprint evidence had been fabricated by Investigator Harding.
Based upon these revelations, the judgment of conviction against claimant was vacated on August 25, 1992. Tompkins County District Attorney George M. Dentes then moved to dismiss the entire indictment against claimant, and it was dismissed on November 9, 1992. No attempt was made to reinstate any criminal charges against claimant for the crimes related to the Harris family murders.
The revelations with regard to Investigator Harding’s conduct in this case (and allegations of similar misconduct by Harding *167 and members of the State Police in other cases) led to an investigation ordered by then Governor Mario Cuomo, who appointed Nelson E. Roth, Esq., as a Special Prosecutor to conduct the investigation. Pursuant to his duties, Mr. Roth prepared a confidential report to then Governor George E. Pataki, which was published in 1997 and is commonly known as the “Roth Report.” Over defendant’s objections, this report was received into evidence at trial (exhibit 61). After having fully reviewed the report, the court did not consider or rely upon any of the conclusions or opinions contained therein in its deliberations on this claim.
Discussion
Negligent Supervision
In its prior decision and order,[3] this court dismissed any cause of action seeking damages based upon negligent investigation, but did retain a cause of action alleging negligent training and supervision. As previously indicated herein, claimant has withdrawn any cause of action sounding in negligent training and/or hiring. She did, however, present proof at trial with regard to the negligent supervision cause of action.
In a decision based upon similar police conduct[4] (which also involved the fabrication of fingerprint evidence by Investigator Harding), this court had previously determined that the State could not be held vicariously liable, under the doctrine of respondeat superior, for the tortious actions taken by Investigator Harding when he fabricated fingerprint evidence and subsequently offered perjured testimony regarding such evidence. This court determined therein that these actions represented a gross departure from acceptable police conduct and were not acts commonly done by employees within the normal scope of their employment, and therefore could not be attributable to the State vicariously.
In this matter, however, claimant asserts that liability under her negligent supervision cause of action is not based directly upon the actions of Investigator Harding, but rather upon the actions or inaction, of his supervising officers. An employer can be held liable for the torts committed by its employees even where it cannot be held vicariously liable for the employees’ ac *168 tions (State Farm Ins. Co. v Central Parking Sys., Inc., 18 AD3d 859 [2005]).
Initially, the court must first address defendant’s contention that a cause of action for negligent supervision does not exist unless another viable cause of action exists in this court. Relying upon the Court of Appeals decision in Brown v State of New York (89 NY2d 172 [1996]), defendant contends that a negligent supervision cause of action may not be maintained in the absence of an actionable underlying tort. In Brown, the Court of Appeals provided a narrow remedy for damage claims against the State based upon violations of the State Constitution in certain limited circumstances not present in this claim. The Court of Appeals also determined that the negligent training and supervision causes of action alleged in Brown were also valid. Contrary to defendant’s argument, this court finds no language in Brown specifically stating that such causes of action were dependent upon the cause of action alleging violations of the State Constitution.
Furthermore, it is abundantly clear that under different fact patterns, a claim based solely upon allegations of negligent supervision may be maintained against the State. For example, claims alleging negligent supervision of inmates by correction officers within a state correctional facility have long been considered viable, notwithstanding the lack of another underlying actionable tort against the State (see e.g. Sanchez v State of New York, 99 NY2d 247 [2002]).
In this court’s opinion, the better view is whether the underlying tortious activity, even if not actionable against the State, can be directly attributed to, or proximately caused by, negligent supervision. For example, with reference to the situations previously referred to involving inmate assaults within a correctional facility, even though the actual assault by another inmate does not create a cause of action against the State, the negligent supervision of that assailant by correctional personnel can result in liability being imposed against the State.
In the context of the instant claim, even though the tortious activity of Investigator Harding has been determined to be outside the scope of his employment, and therefore not forming a basis for a direct cause of action against the State based upon respondeat superior, the alleged negligent supervision of Investigator Harding by his superior officers, if established, is sufficient to establish liability. It is therefore crucial to determine what information was available to Investigator *169 Harding’s supervisors, and in particular, Senior Investigator McElligott, during the course of their investigation and prosecution of claimant. Significantly, the issue before the court is not whether Senior Investigator McElligott actually believed that Investigator Harding had fabricated evidence in this case, but rather whether his alleged lack of supervision allowed Investigator Harding to proceed, undeterred and undetected, with his scheme to fabricate such evidence in an environment that provided no checks and balances over his actions.
This cause of action is centered upon the actions taken by Investigator Harding, and the process he followed, in fabricating fingerprint evidence which had the effect of establishing claimant’s presence at the Harris family home. In spite of this “evidence,” it should be noted that at all times throughout the criminal proceedings against her, claimant adamantly denied any participation in, or knowledge of, the crimes committed by her son at the Harris home.
As previously indicated, however, a metal gas can had been recovered from the living room in the Harris home, and this can was subject to intense examination for possible fingerprint evidence. On December 26, 1989, three days after the murder investigation had begun, Investigator Harding reported to Senior Investigator McElligott that he was only able to locate three very faint and poor quality latent fingerprints on the can. A Kodak representative was contacted to enhance and photograph these prints with oblique lighting, but this technique proved unsuccessful. The can was taken to the State Automated Fingerprint Identification System (SAFIS) for additional analysis, but again no usable prints were obtained. As the investigation continued, Senior Investigator McElligott continued to make inquiries regarding the fingerprints, but Investigator Harding could not provide him with any usable information to assist in the investigation.
On February 3, 1990, after Shirley Kinge had been identified as a suspect, and only after Investigator Harding had gone undercover and met with her, Investigator Harding then reported to Senior Investigators McElligott and Chandler that he had been able to match two latent fingerprints from the metal gas can with claimant’s fingerprints. Although Senior Investigator McElligott recalled at that time that there had not been any usable prints obtained from the gas can (based on Harding’s earlier reports), the State Police nevertheless now had direct evidence placing claimant at the Harris home.
*170 After claimant was taken into custody on the morning of February 7, 1990, she was interviewed at length by Senior Investigator Chandler and Investigator George Clum. Her interrogation lasted approximately seven hours. Investigator Clum testified that at the conclusion of the interview, Senior Investigator Chandler remarked, based upon her demeanor and responses to questioning, that if not for the fingerprint evidence, he would believe that claimant had not been in the house. According to his testimony, Investigator Clum, at the time, agreed with Senior Investigator Chandler’s analysis.
Several days after claimant’s arrest, Investigator Harding testified at a preliminary hearing at the Town of Dryden Justice Court. Senior Investigator McElligott confronted Investigator Harding immediately following this hearing, when he observed Investigator Harding in possession of claimant’s fingerprint card, without any evidence tag or evidence bag. The improper handling of this fingerprint evidence was clearly a violation of State Police protocols regarding the preservation of evidence, a fact which Senior Investigator McElligott was well aware.
In this court’s opinion, it is of critical importance that following this confrontation, Senior Investigator McElligott decided not to make any official report of Investigator Harding’s mishandling of this evidence, even though such conduct constituted a clear violation of State Police rules and regulations. Senior Investigator McElligott certainly knew that the fingerprint evidence was a crucial piece of evidence implicating claimant in these crimes, and that Investigator Harding, by his mishandling of evidence, had jeopardized the admissibility of such evidence at any criminal trial.
Furthermore, in this court’s opinion, Senior Investigator Mc-Elligott’s conduct following this confrontation is similarly questionable. At trial, Senior Investigator McElligott testified that he never took any further action to ensure that the fingerprint evidence, and in particular the evidence card, was properly handled from that point forward. Senior Investigator McElligott certainly had the authority to take possession of the fingerprint card at that time and personally ensure that it was properly tagged and handled. At the absolute minimum, he should have taken some action to confirm that Investigator Harding had fully complied with his directive to preserve this evidence. As it turns out, Senior Investigator McElligott did nothing but turn a blind eye to this situation, even though he knew full well that such evidence was of extreme importance in the prosecution of claimant.
*171 Additionally, prior to claimant’s criminal trial, Investigator Martin E. Hughes, who was trained in fingerprint classification, identification, and processing, met with District Attorney Dentes to assist him in his preparation for the upcoming trial. During this preparation, Investigator Hughes noted several problems with the handling of the fingerprint evidence by Investigator Harding. Specifically, the latent fingerprints had not been photographed prior to lifting from the gas can; no markings had been made on the can to identify the origin of the fingerprints; and the fingerprint “lifters” had been cut down from their original size.
Furthermore, during the trial, it was learned that Investigator Harding had improperly “wiped” the gas can, thereby removing any evidence that fingerprints had ever been on the can in the first place. Although there is no evidence or testimony to establish that Senior Investigator McElligott was aware of these violations of protocol in the accumulation and preservation of evidence, such deficiencies further support the contention that Investigator Harding, in this instance, was not subject to any supervision whatsoever during the prosecution of claimant.
Based on the foregoing, the court finds that Senior Investigator McElligott, who had previously expressed doubt as to the existence of any usable fingerprint evidence whatsoever and had concerns as to the reliability of the evidence produced by Investigator Harding, by his lack of action and oversight, provided Investigator Harding with the opportunity not only to fabricate fingerprint evidence, but also to then proceed, without challenge or any realistic fear of detection, in providing false testimony regarding such evidence. Such action, or more accurately the absence of any action in supervision or oversight, is particularly offensive when minimal supervision could have prevented the use of such tainted evidence, which was of critical importance in the prosecution and conviction of claimant.
In sum, during the course of this investigation, Senior Investigator McElligott, as Investigator Harding’s supervisor, had directly observed Investigator Harding mishandle crucial fingerprint evidence. Not only did he fail to report this misconduct, he failed to take any action whatsoever to ensure that such evidence was then properly secured and preserved. The court finds that such conduct established a complete lack of supervision, which certainly rises to the level of negligence, and claimant has therefore established her cause of action for negligent supervision.
*172 Malicious Prosecution
In order to succeed on a cause of action based upon the tort of malicious prosecution, a claimant must establish (1) the commencement or continuation of a criminal proceeding by the defendant against a claimant, (2) a determination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding, and (4) actual malice on the part of the defendant (Broughton v State of New York, 37 NY2d 451, 457 [1975], cert denied sub nom. Schanbarger v Kellogg, 423 US 929 [1975]).
In this particular claim, there is no dispute that legal proceedings were commenced against claimant, which began with her arraignment on February 7, 1990. There is also no dispute that these proceedings were subsequently terminated in her favor, when the entire indictment against her was dismissed on November 9, 1992. Accordingly, this court must determine whether probable cause existed for the prosecution of claimant, and whether such prosecution was conducted with actual malice.
At the outset, and as previously discussed, there is no dispute that law enforcement authorities, during the course of their investigation and subsequent prosecution of claimant, relied upon fingerprint evidence which ultimately was found to have been fabricated by Investigator Harding. Additionally, there is no dispute that both Investigator Harding and Investigator Lishansky provided perjured testimony in the proceedings against claimant. There is also no dispute that this fabricated evidence tied claimant to the scene of the quadruple homicides, despite her adamant protestations to the contrary.
In relatively simple terms, the issue before the court is whether law enforcement authorities would have prosecuted claimant for the serious arson and burglary charges occurring at the Harris family home if, at the time, they did not have the fingerprint evidence placing her at the scene of the crime. Although such a question is simply stated, the court has the difficult task of determining whether probable cause existed for the arrest and prosecution of claimant when this fabricated evidence is eliminated, after the fact, from the sum total of evidence in existence at that time.
Obviously, it is not for this court to determine whether claimant actually committed the crimes occurring at the Harris family home, but rather whether law enforcement personnel could reasonably believe that she had participated in those crimes with her son. Her ultimate guilt or innocence of these crimes is not before this court for resolution.
*173 Probable cause is based upon a reasonable ground for belief of guilt (Brinegar v United States, 338 US 160, 175 [1949]). It has been defined as consisting of such facts and circumstances which would lead a reasonably prudent person in like circumstances to believe that a claimant is guilty (Hyman v New York Cent. R.R. Co., 240 NY 137, 143 [1925]). This belief “must not only be reasonable, but it must appear to be at least more probable than not that a crime has taken place and that the one arrested is its perpetrator, for conduct equally compatible with guilt or innocence will not suffice.” (People v Carrasquillo, 54 NY2d 248, 254 [1981].)
In this case claimant, within hours after the crimes committed at the Harris family home, forged the name of Dolores Harris, one of the victims, to a credit card, went shopping with her son, and used this card to purchase personal items at various shopping malls in the central New York area. As a result of these actions, she was identified as a suspect, based upon composite sketches, well before any fingerprint “match” was provided by Investigator Harding. Furthermore, once she had been identified as a potential suspect, the State Police continued their investigation and learned that claimant had previously worked for the individual who had developed the area in which the Harris home was located, and that she cleaned houses and other premises for a living. These facts, in this court’s opinion, were sufficient to provide police with a reasonable suspicion that claimant, who was familiar with the area, could have also cleaned the Harris home to remove any incriminating evidence prior to the arson.
It is significant that claimant was identified as a suspect prior to the fabrication of the fingerprint evidence by Investigator Harding. Indeed, it was only after she had been identified as a suspect (through her use of the credit card) that Investigator Harding had the opportunity to go undercover, meet with claimant, and presumably obtain items from which her fingerprints could be lifted.
In this particular case, the court therefore finds that it was both reasonable and logical for law enforcement personnel to view claimant as a principal suspect in all of the crimes which occurred at the Harris family home, at the point in time when she was identified as the person possessing and using the credit card belonging to Dolores Harris, which use occurred within hours after the homicides were discovered. Based upon her use of the credit card, the court therefore finds that probable cause existed for her arrest.
*174 The inquiry as to the existence of probable cause, however, does not end at this point. Although probable cause existed for the arrest of claimant, the court must also determine whether such probable cause continued throughout the course of the criminal investigation and subsequent proceedings against her, a distinction which has been previously recognized (Maxwell v City of New York, 156 AD2d 28 [1990]; Mejia v City of New York, 119 F Supp 2d 232 [2000]).
From the testimony presented, it appears to this court that probable cause to continue with the criminal proceedings against claimant for the crimes which occurred at the Harris family home was based upon three primary factors. The first factor, as previously mentioned, was claimant’s possession and use of a credit card belonging to Dolores Harris, coupled with the fact that such use occurred within hours after discovery of the homicides. As discussed herein, claimant’s use of this credit card, and her subsequent identification as the person using the card, led police to view her as a suspect in these heinous crimes. A second factor relied upon by police was the identification provided by Professor Sutphin which placed claimant near the Harris family home at the time of these crimes. As previously indicated herein, this identification, however, was, for all practical purposes, retracted by Professor Sutphin a short time before claimant’s arrest. Once Professor Sutphin revised his prior statement, the State Police had no reliable eyewitness evidence placing claimant at or near the scene at a time when the crimes occurred. The third factor, obviously, was the fingerprint evidence produced by Investigator Harding which was eventually (well after claimant’s conviction) revealed to be completely fabricated.
Therefore, without the identification provided by Professor Sutphin (which was essentially retracted) and excluding the tainted fingerprint evidence, the only significant evidence tying claimant to the crimes which occurred at the Harris home consisted of her possession and use of the Dolores Harris credit card. The court notes that following her interrogation, claimant did admit to the possession, forgery, and use of this credit card.
Therefore, the issue now becomes whether claimant’s use and possession of this credit card, standing alone, established sufficient probable cause to prosecute her for the crimes occurring at the Harris home. Defendant relies upon the “recent exclusive possession rule” as justification for its prosecution of claimant for these crimes. This rule has been defined as follows: “If a de *175 fendant is found in exclusive possession soon after the crime and there is no evidence indicating that he may have received the stolen property from someone else, the only inference that can be drawn is that defendant is the thief.” (People v Baskerville, 60 NY2d 374, 382 [1983].) Such an inference is sufficient to establish a prima facie case, and if unexplained, enables a jury to establish guilt beyond a reasonable doubt (People v Galbo, 218 NY 283 [1916]).
George M. Dentes, the Tompkins County District Attorney who prosecuted claimant, testified at trial that under this rule, claimant’s use of the credit card provided sufficient evidence to justify his prosecution of claimant for the crimes committed at the Harris home. In his testimony, he acknowledged that the fabricated fingerprints constituted the only evidence directly placing claimant at the Harris home, but nevertheless testified that in his opinion, claimant’s use of the credit card would have been sufficient to sustain a conviction for the crimes committed at the Harris home, based upon the “recent exclusive possession” rule.
While this court has great respect for Mr. Dentes, his testimony at this trial was directly at odds with the actions taken by him after Investigator Harding’s misconduct was revealed. At that time, Mr. Dentes moved for dismissal of the entire indictment against claimant. In his affidavit in support of this motion, Mr. Dentes stated that “[t]he key proof of defendant’s presence at the Harris home was the testimony of Inv. David Harding, of the New York State Police.” Since this evidence had been fabricated, he then stated that “[i]t thus appears that there is no reliable evidence that defendant was at the Harris home.” (See exhibit 24.)
Although Mr. Dentes testified at trial that another reason for his decision to seek dismissal of the indictment was the “stink”[5] of the State Police evidence-tampering scandal and investigation, the court accords great weight to his statements made in support of his application for dismissal. At that time, District Attorney Dentes was quite explicit that without the fingerprint evidence there was no reliable evidence placing claimant at the Harris home, and as a result there existed no basis on which to continue with proceedings against claimant for those crimes which occurred at the Harris home.
*176 Testimony at trial also established that this opinion had been expressed in the early stages of the investigation against claimant. Following their extensive interrogation of claimant, Senior Investigator Chandler and Investigator Clum agreed that without the fingerprint evidence, they would have believed claimant when she maintained throughout her interrogation that she had not been present at the Harris home.
Based on the foregoing, therefore, it is the opinion of this court that without the fabricated fingerprint evidence, it is reasonable to assume that claimant, despite her use of the stolen credit card, would not have been prosecuted for any of the crimes occurring at the Harris family home, due to the absence of any probable cause linking her to these specific crimes.
In order to succeed with her malicious prosecution claim, however, claimant must also establish that the criminal proceedings against her were conducted with “actual malice.” This element does not require that a claimant must establish that the defendant was motivated by spite or hatred, but rather that the proceeding was conducted due to a wrong or improper motive (Nardelli v Stamberg, 44 NY2d 500 [1978]; Maxwell v City of New York, 156 AD2d 28 [1990]). Actual malice may be established from gross and culpable negligence, such as a failure to make reasonable inquiries before starting proceedings (Martin v City of Albany, 42 NY2d 13 [1977]), or from the reckless disregard of the rights of the claimant (Boose v City of Rochester, 71 AD2d 59 [1979]).
In this court’s opinion, Senior Investigator McElligott’s negligent supervision (previously discussed herein), which in effect provided Investigator Harding with ample opportunity to fabricate fingerprint evidence placing claimant at the scene of the crimes, is clearly sufficient to establish a blatant disregard of claimant’s rights, and as such satisfies the “actual malice” element of the malicious prosecution cause of action.
The court would be remiss if it did not refer to a prior decision of this court, Prentice v State of New York, previously referred to herein,[6] on which both parties relied. Prentice was also a malicious prosecution claim which was based upon allegations of evidence tampering by Investigator Harding. Although the fabrication of fingerprint evidence by Investigator Harding was also conclusively established in that claim, this court nevertheless dismissed the malicious prosecution claim. A crucial *177 distinction exists, however, in these two cases. In Prentice, following the revelation of Investigator Harding’s misconduct, Mr. Prentice was reindicted by a grand jury, and convicted after trial. His conviction from that second trial was later reversed, and he eventually was acquitted after a third trial, leading to his malicious prosecution claim. In the instant claim, however, not only was there no effort made to reindict claimant, but District Attorney Dentes specifically acknowledged that there was no reliable evidence on which to proceed against claimant.
In sum, the actions of Senior Investigator McElligott, or in this case, an unjustified and complete lack of supervision and control, allowed Investigator Harding the time and opportunity to fabricate fingerprint evidence which ultimately became the only significant evidence placing claimant at the Harris home. There can be no dispute that such fabricated evidence played a key role in her conviction for these crimes. Without such evidence, this court finds that probable cause did not exist to prosecute claimant for any of the crimes which occurred at the Harris family home. Claimant has established her malicious prosecution cause of action.
In retrospect, and based on these findings, this claim should have been a relatively easy one on which to determine the issue of liability. Claimant, however, obviously did not appear before this court with “clean hands,” and she has not engendered any great sympathy from this court. Claimant’s own admitted criminal conduct in possessing, utilizing, and forging the signature of Dolores Harris on a credit card brought the focus of the investigation upon her. Despite her testimony to the contrary at this trial, the court finds that claimant was a willing participant with her son in this scheme to use credit cards belonging to the Harris family. Even if the court accepts her testimony that she was completely unaware of what transpired at the Harris home, her willingness to participate has been established by her actions in forging a signature to a credit card, and then using that card, which was indisputably obtained from the Harris home, to purchase personal items for her own benefit within hours of the burglary, murders, and arson.
Even so, such criminal conduct cannot be used as a shield by the State Police to either justify or excuse their actions which directly led to claimant’s conviction. As this court has found, minimal supervision over Investigator Harding would have prevented his reprehensible conduct in the fabrication of fingerprint evidence. In this court’s opinion, such minimal *178 supervision would also have prevented the prosecution of claimant for the horrific crimes committed by her son at the Harris home.
Notwithstanding the fact that the court has found in her favor, claimant should take no satisfaction in this decision. She should be ashamed of her criminal conduct. However, throughout history a crucial question for society has been how to protect its citizens from abuses by those individuals who swear to guard them and enforce the laws. Put another way, who guards the guardians? The answer is: the courts.
Accordingly, based upon the foregoing, this court finds the defendant liable to the claimant upon both her negligent supervision and malicious prosecution causes of action.
Any motions not heretofore ruled upon are hereby denied.

. (See decision and order to motion Nos. M-66691, CM-66986, UID No. 2004-009-61.) Unpublished decisions and selected orders of the Court of Claims are available via the Internet at http://www.nyscourtofclaims.state.ny.us/ decisions.

. It was subsequently determined that three separate fires had been set in the upstairs of the Harris home.

. See decision and order to motion No. M-56122.

. Prentice v State of New York, 4 Misc 3d 1008(A), 2004 NY Slip Op 50784(11) (claim No. 91731, motion Nos. M-65785, M-65786, UID No. 2004-009-01, Mar. 30, 2004, Midey, J.).

. Unless otherwise indicated, all references and quotations are taken from the court’s trial notes.

. See n 4.