ANTON HYLSKY, Appellant, v. GLOBE DEMOCRAT PUBLISHING COMPANY, a Corporation.—152 S. W. (2d) 119.

Division One, June 12, 1941.

*Earl M. Pirkey* for appellant.

*Jones, Hocker, Gladney & Grand* for respondent.

DALTON, C.—This is an action for damages for publishing alleged libelous article. Plaintiff asked $50,000 actual and $50,000 punitive damages. Defendant demurred to the petition ▮ on the ground that it failed to state "facts sufficient in law to constitute a

cause of action against defendant.'' The trial court sustained the demurrer. Plaintiff elected to stand upon his petition, refused to plead further and judgment was entered for defendant. Plaintiff has appealed.

The petition alleged that on February 20, 1937, defendant maliciously published in its newspaper of and concerning plaintiff a false, defamatory and libelous article, to-wit:

''CONFESSES MURDER OF HEALER.
(Picture)
''Patient of Geo. Zellman
Clears Widow and
Paramour
''Frank Slezak, 54, Says Victim
Had Put 'Spell
On Him.'

---

''2 Indicted For
E. Side Killing

---

''Officer Working Alone
Solves Case, Trapping
Own Friend.

---

''A confession in the murder of George Zellman, 76-year-old Rosicrucian psychic healer, was obtained by an East St. Louis detective sergeant last night from Frank Slezak, 54, a former packinghouse worker, who is held in the observation ward of St. Mary's Hospital, East St. Louis.

''Slezak, a former patient of the healer, told police, they said, how he came to hate the man to whom he had gone for help and finally, alone with Zellman, he drew a pistol and started firing.

''Meanwhile Zellman's widow, Mrs. Cecilia Zellman, and her paramour, Thomas Pierce, are held in jail at Belleville under indictment for the murder and are due to be brought to trial next month. East St. Louis police said they would check Slezak's strange story of the shooting in the home of the healer on February 5. Part of his story will be compared with details of the various confessions of Mrs. Zellman. Pierce has consistently denied any connection with the murder.'' (The article continued with matters with reference to the alleged confession of Slezak, and then continued.)

''Detective Sergeant Anton Hylsky is responsible for the confession by Slezak, which East St. Louis police regard as clearing up the case. Hylsky had taken part in the questioning of Mrs. Zellman, but had not otherwise been detailed to the case and his investigation was done while unoccupied with other police assignments. . . .

''Hylsky, who was aware of the half a dozen versions of the killing

given police by Mrs. Zellman, in some of which she named herself as the slayer and in one other Pierce as the killer, took up the case after the pair had been indicted a week ago and locked in the County Jail at Belleville.

"Proceeding on the theory the stories told by Mrs. Zellman were all due to nervous frenzy, Hylsky examined a ledger of Zellman's which showed the names of all his clients and examined such of them as he knew.

"Among them were Slezak. The latter speaks very little English and carries on all his conversation in Bohemian which Hylsky speaks fluently.

"Tuesday Slezak attempted to commit suicide. . . ." (after giving details, the article continued).

"Hylsky, who lives at 1118 Lynch avenue, has been a friend of Slezak for 15 years and had seriously considered the possibility he might have been involved in the case, recalling Slezak had been subject to spells of depression since the death of his wife more than a year ago. When he heard of the attempted suicide he went to the hospital to visit Slezak and asked him why he had attempted to destroy himself.

"Hylsky quoted Slezak as saying he had been having terrible dreams for the three nights prior to his suicide attempt.

". 'I think I have shot and killed a man,' the detective quoted the patient as saying, 'but I can't remember, my mind is so hazy.'

"As a result of this statement Hylsky went to the Lynch avenue home, where he searched until he found the revolver hidden in the basement under some rags. The weapon still had the five discharged shells in it. He took the pistol to the hospital, where Slezak talked freely but incoherently of the shooting." (The article then reviewed the confession at length).

After setting out the above article in full, the petition charged:

"That said publication was likely to and did raise the inference and communicate to the public the ideas and statements that plaintiff had deceived his own friend to such friend's injury and that plaintiff by dishonorable artifice had enticed his own friend into an injurious and harmful trap and that plaintiff had posed as a true friend and as seeking the welfare of his own friend when in truth and fact he was undertaking to wrongfully mislead and injure and destroy said friend by wrongful deception and that plaintiff was not worthy of the confidence or friendship of honorable persons and that plaintiff was tricky and treacherous and dishonorable and would stoop to dishonorable and repulsive and wrongful methods to wrongfully injure for his own benefit persons who confided in him and that plaintiff had wrongfully posed as the friend of Frank Slezak and pretended to be acting rightfully and in the discharge of his duty for the purpose of wrongfully deceiving and injuring said Slezak;

"That plaintiff was at the times herein mentioned a sergeant of the police of East St. Louis, Illinois, and had been such for years;

"That said publication was likely to and tended to and did provoke plaintiff to wrath and expose him to public hatred and public contempt and public ridicule and public execration and deprive him of the benefits of public confidence and of social intercourse and said publication was likely to and did damage and will damage the name and reputation of plaintiff as a citizen and honorable man and a man of integrity and also as a police officer and it has caused and will cause him great mental and physical pain and suffering and it has injured and will injure his reputation and the same was published as aforesaid of and concerning plaintiff by defendant to a great number of persons in East St. Louis, Illinois, and the rest of the world to the great damage to plaintiff as aforesaid."

Appellant's position is that "if a false article tends to provoke plaintiff to wrath or exposes him to public hatred or public contempt or public ridicule or public execration or deprives him of the benefits of public confidence or of social intercourse then the article under the statute and on the decisions is libelous;" that the word "trap," a noun, means a device, a pitfall, snare or contrivance by which one may be caught unawares; that the word, "trap," a verb, means to catch in a trap, to take by strategy or by artifice or wiles. Appellant contends that the article stated that plaintiff trapped his own friend; that plaintiff, in trapping his own friend, was not performing any services required by any form of law, but was a volunteer in the alleged work of trapping; that the statement to the effect that plaintiff had trapped his friend was false; that "the ordinary meaning of the word 'trap' carries out the idea of deception to the deceived person's injury;" that the article charges that plaintiff had deceived Slezak to his injury by trapping him, by posing as his friend, meaning that he betrayed, deceived and ensnared him by dishonorable means; and that, therefore, the article "accuses plaintiff of wicked and contemptible and wrongful conduct and is, therefore, libelous." Appellant further says that entrapping is considered to be conduct which is dishonorable and improper, "condemned by Holy writ and the cases cited."

Respondent contends that a publication in order to be libelous must be defamatory; that the article in question had to do with a matter of great public interest, since a murder had been committed and the wife of the victim and her paramour had been indicted; that plaintiff was a police officer and it was his duty to discover and apprehend persons guilty of serious crimes, whether his friends or otherwise; that it was his paramount duty to the public to discover the wrongdoers, even though in so doing he might violate the ties of friendship; that in order for a publication to be libelous it must speak ill of the claimant; that this article, as a whole was distinctly

commendatory to plaintiff and not defamatory; and that the innuendoes alleged by plaintiff are not supported by the article itself, but are strained, forced and unnatural.

Respondent is correct in its contention that the court must look to the entire article and construe it as a whole in order to determine whether it is libelous. [Grossman v. Globe Democrat Publishing Co., 347 Mo. 869, 149 S. W. (2d) 362, 365; Warren v. Pulitizer Publishing Co., 336 Mo. 184, 78 S. W. (2d) 404, 417; Clark v. McBaine, 299 Mo. 77, 252 S. W. 428; Diener v. Star-Chronicle Publishing Co., 232 Mo. 416, 429, 135 S. W. 6; 33 Am. Jur., sec. 87, p. 100.] "All parts of the publication must be read together to collect the true meaning. Phrases and words must not be singled out and wrenched from a context explanatory or indicative of meaning. The whole article is its own best interpreter. So, words take color from the occasion of speaking them." [Diener v. Star-Chronicle Publishing Co., 230 Mo. 613, 625, 132 S. W. 1143.]

The same rule applies to headlines. "The rule is general that both the headline ▇▇▇▇ and the item to which it is attached are to be considered as one document in determining the effect of an article complained of as being defamatory. They are construed together in deciding whether the article is libelous, to ascertain the character of the libel, and to find against whom the libel is directed." [33 Am. Jur., sec. 88, p. 101.]

In interpreting the alleged libelous article, words must be taken in their plain and ordinary meaning. "They will be construed fairly by their natural import, according to the ideas they are calculated and intended to convey to those to whom they were addressed, and pinned down to some one commonly accepted meaning, one generally understood." [Diener v. Star-Chronicle Publishing Company, supra, 230 Mo. 613, 132 S. W. 1143; Grossman v. Globe Democrat Publishing Co., supra, 347 Mo. 869, 149 S. W. (2d) 362, 365; 33 Am. Jur. 97, sec. 84; 36 C. J. 1157, sec. 21.]

A publication in order to be libelous must be defamatory. Section 4758, R. S. 1939 (4 Mo. Stat. Ann., p. 3024, sec. 4366), defines libel as follows: "A libel is the malicious defamation of a person made public by any printing, writing, sign, picture, representation or effigy tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse, . . ." This definition applies to civil and criminal cases. [Link v. Hamlin, 270 Mo. 319, 335, 193 S. W. 587, 592.]

The application of the above statute is well illustrated by Judge LAMM, in the case of Diener v. Star-Chronicle Publishing Co., supra, (232 Mo. 416, 433, 135 S. W. 6) where he said: "Finally, it is argued that the tendency of the publication was to expose plaintiff to 'public hatred, contempt or ridicule, or to deprive him of the benefits of

public confidence and social intercourse, etc.' [R. S. 1899, sec. 2259.] But he who thinks that an article merely having that tendency is either a civil or a criminal libel has studied the law of libel to little purpose. The controlling words in that section are 'malicious defamation' by means of printing and writing, etc., tending to provoke him to wrath or expose him, etc. There must be defamation in a libelous sense before there can be a libel. Otherwise, alarming results would follow. For instance: in a community believing in beer and wine drinking a good devotee of total abstinence would be libeled by a mere expose of his true principles, thereby necessarily holding him up to public scorn, contempt, etc., among his bibulous neighbors. To make a libel there must be defamation in the sense of the law before the public scorn and contempt feature is operative. Defamation includes the idea of calumny, aspersion by lying—the injury of another's reputation in that way. To defame is to speak evil of one maliciously, to dishonor, to render infamous.''

Now to apply the above principles to the case before us. As we have seen, appellant relies particularly upon the statement in the last headline, to-wit, ''Officer Working Alone Solves Case, Trapping Own Friend.'' The petition concedes that plaintiff was ''a sergeant of the police of East St. Louis, Illinois, and had been such for years.'' The subject matter of the article concerns the apprehension of an alleged murderer, at a time when charges were pending against others for the alleged offense. Appellant contends that the word ''trapping,'' as used in the headline, implied deception and subterfuge. He claims the article accuses him of wicked, wrongful and contemptible conduct, and charges him with having deceived the accused to his injury. We are unable to apprehend how appellant, a police officer, was defamed by the conduct ascribed to him in the article. On the other hand, the obtaining of the confession and the solving of the crime detailed in the article could not be classified as misconduct, or of anything comparable to neglect of duty, dishonesty, favoritism, want of integrity, or brutality, ordinarily thought of in connection with misconduct of a police officer. The article must be read and considered as a whole, and when so read the conclusion and inferences alleged by plaintiff are unsupported by the terms of the article.

Appellant says: ''The defendant's article, in this case, follows the artifice and practice used by . . . (certain named) newspapers in which they wish to poison and injure the reputation of a man by venomous headlines and say nothing further on that subject in the body of the article, thereby escaping punishment by claiming that the article is not libelous;'' that, after the poisonous headline concerning the plaintiff was put in position where it would be read by everybody and was emphasized, the article itself did not tell or describe how the ''trapping'' was done. Did the article state how the arrest and confession was brought about? We think it did.

90

Reviewing ▮▮▮the article we find that plaintiff's name does not appear in the headline, but far down in the body of the article. Considering the article as a whole, it first states that a confession was obtained from Frank Slezak by an East St. Louis detective sergeant. Later the article names plaintiff and states that he was responsible for the confession, clearing up the case. It states that plaintiff took up the case after certain indictments had been returned; that plaintiff had not otherwise been *detailed* to the case and his investigation was done while *unoccupied* with other police assignments. (We do not understand from this that plaintiff was off duty; only that he had not been specifically assigned to the case.) It then tells how the confession was secured, to-wit, that plaintiff had known Slezak for fifteen years and had considered the possibility that he might have been involved in the case; that, when plaintiff heard of the attempted suicide by Slezak, he asked Slezak why he had made the attempt. After receiving a reply, which apparently increased plaintiff's suspicion, plaintiff searched Slezak's home and found the weapon. He exhibited the revolver to Slezak, who then confessed the crime. We are unable to draw the inferences alleged by plaintiff, to-wit: ''That plaintiff had deceived his own friend to such friend's injury and that plaintiff by dishonorable artifice had enticed his own friend into an injurious and harmful trap.'' · When the article is considered as a whole, the word ''trapping'' in the headlines meant no more than that the officer had caught or apprehended the murderer; and that a confession had been obtained.

In the case of Diener v. Star-Chronicle Publishing Co., supra, 230 Mo. 613, 618, 132 S. W. 1143, the court considered a published statement that plaintiff, a chauffeur, ''had run down and killed a little child in the street,'' and referred to ''the mangling of such little tots.'' In that case plaintiff charged by innuendo that defendant ''meant to charge the plaintiff with a crime involving moral turpitude, and with willfully and wantonly taking the life of a human being.'' The court held the word ''killed'' and the word ''mangled'' must be considered in the light of the context; that an automobile was not a lethal weapon like a gun or pistol; that no intent to kill was presumed; and that the word, as used, meant no more than ''that the child died as the result of the collision, (that) it was 'killed' thereby.'' The court further said: ''So long as a publication is not directed to a public officer by charging corruption or other criminal misfeasance or non-feasance, so long as it is not directed to the defamation of an individual in his private character or business, but is directed to a matter of live public concern and is for an honest and not a defamatory purpose, it is qualifiedly privileged.'' [See, Diener v. Star-Chronicle Publishing Co., supra, 232 Mo. 416, 428, 135 S. W. 6.]

In the case under consideration, an alleged murderer had been arrested and confessed to the crime. Prior to that time two other

persons, according to the article, had been indicted for the offense. The matter was of great public interest. Appellant, a police officer, was given credit for solving the crime, securing the arrest of the murderer and obtaining his confession. The alleged facts as to how appellant proceeded and as to how the confession was obtained are set out. In our opinion the words of the alleged libelous publication are not reasonably susceptible of any defamatory meaning, and therefore, the article was not defamatory of appellant and not libelous.

The demurrer, which admitted the fact of publication and the words used, did not admit the unfair and forced construction put upon the article and words by the petition. Whether the words of the publication could reasonably bear such interpretation was a question of law, and could be reached by demurrer. [Diener v. Star-Chronicle Publishing Co., supra, 232 Mo. 416, 431, 135 S. W. 6; Newell, Slander and Libel (4 Ed.), p. 294, sec. 254.] We think the innuendoes pleaded were forced and strained, but such innuendoes could not enlarge or restrict the natural meaning of the words used and the context in which they are found. [Grossman v. Globe Democrat Publishing Co., supra, 347 Mo. 869, 149 S. W. (2d) 362, 366; Odgers, Libel and Slander (5 Ed.), p. 116.] Since the article itself and the words used do not support the innuendoes, it follows that the demurrer was properly sustained.

The judgment is affirmed. *Hyde* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.