[No. D052743. Fourth Dist., Div. One. May 14, 2009.]

JOSE BALZAGA et al., Plaintiffs and Appellants, v.
FOX NEWS NETWORK, LLC, Defendant and Respondent.

1326

**COUNSEL**

Mitchell & Gilleon, James C. Mitchell and Daniel M. Gilleon for Plaintiffs and Appellants.

Sheppard Mullin Richter & Hampton and Guylyn R. Cummins for Defendant and Respondent.

OPINION

HALLER, J.—The Fox News Network, LLC, broadcast a four-minute story featuring an anti-illegal immigration activist, John Monti, who claimed he was attacked by several immigrants seeking work as day laborers. During the broadcast, Monti described the attack and showed a poster of photographs he had taken of his alleged attackers. Monti also complained that the police were not taking the matter seriously and discussed the larger problems associated with illegal immigrants living in outdoor "migrant camps." During the entire story, the caption "MANHUNT AT THE BORDER" was displayed at the bottom of the television screen.

Seven of the individuals whose photographs were shown on the poster (plaintiffs[1]) filed a complaint against Fox News Network, LLC (Fox News), alleging a defamation cause of action.[2] Fox News moved to strike the complaint under California's anti-SLAPP law.[3] Plaintiffs conceded their claim was governed by the anti-SLAPP statute, but argued the motion should be denied because there was a probability they would prevail on their defamation claim. After considering the parties' submissions and arguments, the court found plaintiffs did not meet their burden to show a probability of prevailing on their claim, and granted the motion. Plaintiffs appeal. We affirm.

Plaintiffs' defamation action against Fox News is predicated on their claim that the "MANHUNT AT THE BORDER" caption falsely suggested that *law enforcement* was conducting a search *for plaintiffs*. We conclude that, when considered in context of the entire telecast, the caption was not reasonably susceptible of this meaning. Thus, plaintiffs did not meet their burden to establish a probability of prevailing on their defamation claim, and the court properly granted defendant's anti-SLAPP motion.

## FACTUAL SUMMARY

On November 18, 2006, John Monti was taking photographs of several men who work as day laborers, when he became involved in a physical dispute with one or more of these individuals. Later that day, Monti reported to the police that he had been attacked by these men. Police officers arrested

---

[1] Plaintiffs are Jose Balzaga, Estanislao Gonzalez, Alberto Jimenez, Ascension Hernandez, Aristeo Lopez, Roberto Pena, and Ricardo Valle.

[2] Plaintiffs also sued John Monti and Jeff Schwilk, a leader of the San Diego Minutemen, an immigration-related organization. Plaintiffs' claims against these defendants are not before us on this appeal.

[3] SLAPP is an acronym for strategic lawsuit against public participation. (See Code Civ. Proc., § 425.16 (section 425.16).)

one of the day laborers, Jose Balzaga, but released him after questioning. The police then continued to investigate.

Ten days after the incident, while the police investigation was continuing, Monti appeared on Fox News's *Hannity & Colmes* television show to discuss his version of the events and other issues related to immigration. Because this telecast is the basis for plaintiffs' claims against Fox News, we set forth the contents of the show in some detail.

The telecast begins by showing closeups of wounds on a person's hands and face. Underneath these pictures, the caption states "MANHUNT AT THE BORDER." This caption remained throughout the four-minute story. While the closeups of the wounds were shown, one of the news anchors, Alan Colmes, stated: "The San Diego Police are investigating an attack on an anti-illegal immigration advocate near a migrants' encampment close to the San Diego/Mexico border. The victim managed to take these photographs of his alleged attackers before the crime took place, and now needs your help. We're joined now from the scene of the incident by the assault victim, John Monti. John, thanks for being with us. Explain to us what happened to you, what was going on."

Monti, who is standing in a canyonlike area, responded: "[T]hank you for this opportunity to tell my story . . . this is what happened . . . . I had come out to take pictures of the . . . migrants along . . . Rancho Penasquitos Boulevard here in San Diego . . . . [T]he reason why we want to do this is because . . . these day labor spots . . . feed these migrant encampments . . . . I was taking pictures of them, and I wanted to take pictures of some of their employers [who are] employing . . . these men, who are basically living in squalor along the roadsides."

Monti then described in detail how he was attacked by the men while he was taking the photographs. While Monti was discussing the attack, the cameras showed a poster with the photographs of plaintiffs. The poster was entitled "Wanted [—] Robbery, Assault and Battery." The cameras then showed a closeup of each photograph.

During the description of the attacks, the other news anchor, Sean Hannity, interrupted and said: "You referred to this as a hate crime. Lieutenant Tom Warden [of the San Diego Police Department] there says it's not a hate crime, but [the men] were upset because you were taking photographs. Not because what you were doing was illegal, but that clearly sparked their behavior."

Monti responded: "Well, . . . you know, what I think the real hate crime here . . . is how the San Diego Police Department is you know responding to

this crime. I mean, if it had been eight white guys attacking a migrant, I think they would have already tried and convicted . . . the people in the court of public opinion. And, you know, we would have heard of all this sanctimonious rhetoric already about how this could never happen again . . . ."

. Hannity then stated: "I want to make sure for our audience's edification, here—those pictures that we're putting up, those are the pictures that you took of the people that eventually attacked you, correct?"

Monti responded: "Yeh, yeh that is correct. I took their pictures." Monti then engaged in a lengthy narrative about the problems of "migrant camps" in San Diego County. During this narrative, the news anchors attempted to interrupt Monti, but they were unable to do so. Monti's narrative was as follows: "Now what you have to understand here is that, in San Diego County, there is a tremendous problem with these migrant camps, these shanty towns that exist where you have groups of men you know who live outdoors. [¶] . . . [¶] And the reason why they live here, you know—they live there for a number of reasons. Now, the popular belief is to say, oh, it has to be all poverty because they're all poor migrants. But the thing is though . . . many of them choose to live out there because, you know, they don't want to pay rents, or they have personal problems. [¶] . . . [¶] And what we want to see happen is we want these migrant camps removed; you know, the men should have to live in apartments and houses like everyone else. [¶] . . . [¶] These are crime zones. It has to be understood. We have . . . all sorts of crimes. Recently NBC reporter [Ana] Garcia did reports on these . . . encampments. You know we find drug abuse there. You know, every, it seems that every . . . child prostitution spot in the County seems to have a migrant camp associated with it. You know and we want to end you know these crimes. And ending these crimes is going to involve removing these camps. And that's why, you know, we uh, I came out here, and I was going to come out here with other activists to take pictures in order to let people know, you know, you're feeding those camps. . . . And you know there is just, you know, and I mean there's more to it than just . . . . You know there is."

Finally, Colmes interrupted and said: "We're just out of time for this segment. I know there's a lot more to the story—we'll be following it, and we thank you very much for coming and telling your story to us tonight, John. Thank you very much. . . ."

Several months after the show, plaintiffs demanded a retraction, but Fox News declined. Fox News instead invited plaintiffs and their counsel to appear on a show to address Monti's allegations and present their side of the incident. This show aired in March 2007.

The city attorney later brought misdemeanor charges against Monti based on his conduct arising from the November 18 incident. At the September 2007 trial, the jury returned not guilty verdicts on all charges, which included battery, assault, and filing a false police report.

The next month, plaintiffs filed the lawsuit that is the subject of this appeal. The complaint alleged the following: On November 18, 2006, Monti went to a "day laborer site" in northern San Diego County, and taunted the day laborers, called them derogatory names, and photographed them. When one of the plaintiffs attempted to hide his face, Monti grabbed his arm and then chased him, tackled him and punched him several times. Monti then falsely reported to the San Diego Police Department that he had been "attacked" by the day laborers. Shortly after, Monti created a poster with photographs of nine men whom he had encountered at the day laborer site. The photographs were arranged under a caption stating plaintiffs were "Wanted [for] Robbery, Assault and Battery." The bottom of the poster stated that the men in the photographs were " 'suspects,' " and directed anyone who saw or had information about them to call the San Diego Police Department. Monti and others then handed out copies of the posters, and Monti worked with the San Diego Minutemen organization to identify and locate the alleged " 'suspects.' " About 10 days after the incident, Monti appeared on the *Hannity & Colmes* television show, and falsely accused plaintiffs of attacking him. The broadcast showed Monti's wanted poster with the photographs, but did not show the bottom statement that plaintiffs were " 'suspects.' "[4]

Based on these facts, plaintiffs asserted a defamation cause of action against Fox News. Plaintiffs claimed that Fox News "misrepresented that plaintiffs had committed violent crimes and falsely described them as 'wanted' criminals," and these statements were "unprivileged, untrue, and naturally harmful to plaintiffs' reputations." Plaintiffs alleged the " 'Manhunt at the Border' " caption was false because police were merely investigating the crime and were not conducting an organized search for plaintiffs at the time of the broadcast. Plaintiffs alleged that they "were not wanted by law enforcement for assaulting, battering, or robbing Monti . . . . Nor was there ever a 'manhunt at the border' as stated by Hannity & Colmes. In fact, . . . when Fox News aired this false statement, the San Diego Police Department was focusing its investigation solely on Monti." Plaintiffs alleged that as a result of the defamation, they suffered economic damages in lost wages and general damages for emotional distress.

---

[4] This summary of the complaint's factual allegations focuses on plaintiffs' claims against Fox News. We discuss the allegations pertaining to the other defendants (Monti and Schwilk) only to the extent the allegations are relevant to the claims against Fox News.

Several months later, Fox News moved to strike the defamation claim under the anti-SLAPP statute. (§ 425.16.) Fox News argued the defamation claim was subject to the anti-SLAPP statute on various grounds, including that the statements were made in connection with issues under consideration or review by the police department, and the statements concerned issues of public interest. (See § 425.16, subd. (e)(2), (3).) Fox also argued that plaintiffs would be unable to show a probability of prevailing on their defamation claim because the alleged false statements: (1) were not "of and concerning" plaintiffs; (2) the statements were true or substantially true; (3) the statements were privileged as a "fair and true report" under Civil Code section 47, subdivision (d); and (4) the statements were protected as fair comment, hyperbole, and opinion.

In support, Fox News lodged transcripts and computer discs of the November 28 telecast with Monti and the March 2007 telecast with plaintiffs' counsel. Fox News additionally submitted a declaration of a senior producer who stated that before the November 28 broadcast, Fox News contacted the San Diego Police Department, and the department "would confirm only that there was an investigation in progress" based on Monti's police report. Fox News also asked the court to take judicial notice of numerous documents, including various newspaper articles regarding migrant encampments, several police and arrest reports concerning the incident, documents pertaining to the criminal prosecution of Monti for the November 18 incident, and several online dictionary definitions of the word "manhunt." Under the submitted dictionary definitions, a manhunt most commonly refers to an organized, extensive search for a person, usually a fugitive criminal.[5]

In response to the motion, plaintiffs asked for a continuance to conduct "some fairly limited quick discovery" to obtain evidence showing that law enforcement was not conducting a "manhunt" for plaintiffs at the time of the Fox News broadcast. In support, plaintiffs' counsel clarified that "for the purposes of the anti-SLAPP motion, [p]laintiffs limit their allegation that Fox News defamed them *to one single statement. Specifically, [p]laintiffs allege that on . . . the date of the Fox News broadcast at issue, there was no law enforcement 'Manhunt at the Border' for any or all of the seven [p]laintiffs that Fox News showed pictures of during its broadcast. Consequently, that single statement is the only allegedly defamatory statement at issue in Fox News' anti-SLAPP motion.*" (Italics added.) In their papers, plaintiffs explained that "Fox News' assertion—' "Manhunt at the Border" '—is a provably *false* statement of fact that defames them by accusing them of being the subject of a law enforcement criminal 'manhunt.' " Plaintiffs argued they

---

[5] Fox News submitted definitions from the following sources: American Heritage Dictionary of the English Language, Cambridge Dictionary of American English, Cambridge Advanced Learner's Dictionary, Wiktionary, and Wordsmyth.

needed the additional discovery because there is nothing in the police reports that states "either way" whether the police were conducting a "manhunt" for plaintiffs.

In response to the discovery request, Fox News argued there was no need for the discovery, but stated that if the court believed discovery was necessary on the "truth" issue, it would waive this defense for purposes of the anti-SLAPP motion. After a hearing, the court found plaintiffs presented sufficient grounds for a continuance to conduct the requested discovery, but denied plaintiffs' motion based on Fox News's willingness to withdraw its truth defense for purposes of the anti-SLAPP motion.

Plaintiffs then filed an opposition to Fox News's anti-SLAPP motion. In the opposition, plaintiffs did not dispute the applicability of the anti-SLAPP statute, but argued the court should deny the motion because there was a probability they would prevail on the claim. In support, plaintiffs reiterated that they were "not claiming Fox News defamed them based on anything Mr. Monti said" during the broadcast, but that they were seeking to prevail based solely on Fox News's " 'Manhunt at the Border' " caption while showing Monti's wanted poster. Plaintiffs then argued that the caption was not privileged as a "fair and true report" under Civil Code section 47, subdivision (d)(1) because there was no evidence in the police reports that the police were conducting any type of "manhunt" for plaintiffs. Plaintiffs also argued: (1) the caption was "defamatory *per se*" because it referred to a manhunt *by law enforcement officials*; (2) Fox News had waived its truth defense; and (3) the caption was not "opinion" or "hyperbole" because the "statement that there was a law enforcement 'Manhunt at the Border' for Plaintiffs is a demonstrably true or false statement of fact." In filing this opposition, plaintiffs did not present any additional supporting evidentiary materials. Instead, they based their arguments on the pleadings and evidence already before the court.

In reply, Fox News asserted numerous arguments. Of particular relevance here, Fox News argued that the telecast "did not attribute the caption 'Manhunt at the Border' to the police, but instead showed Monti's 'Wanted Poster' and stated: 'The victim managed to take these photographs of his alleged attackers before the crime took place, and now needs your help.' . . . Thus, the broadcast suggests not a law enforcement search, but a search by Monti and the Minutemen[]." Fox News argued that the "broadcast does not imply what Plaintiffs say it does, but even if it did, such an implication is not actionable."

At the hearing on the anti-SLAPP motion, the court stated that after watching the video, "It's pretty clear if there is a manhunt, it's by this guy

[Monti], it's not a police manhunt, it's this Monti guy." Plaintiffs' counsel countered that a "manhunt" generally refers to a search by more than one person and thus must have referred to a *law enforcement* "manhunt." The court responded: "If you take it in the context of the entire broadcast, I don't think that's what you come away with. There's no mention of police, manhunt, there's no inference of it. There's this one guy who's out there on this rant with his pictures and that, and they talk about him, and they have a little caption 'Manhunt at the Border.' I just don't see it."

After the hearing, the trial court granted Fox News's motion, and dismissed the complaint against it. The court found the " 'Manhunt at the Border' " caption was privileged under Civil Code section 47, subdivision (d)(1) because the caption was a " 'fair and true report' (of the 'manhunt' undertaken by Defendant Monti) to a public journal (Fox News) about official proceedings or a verified charge or complaint (the arrest of Plaintiff Balzaga and police investigation of the incident involving Defendant Monti)." The court alternatively found the caption was privileged as "fair comment, opinion, and hyperbole." The court reasoned that "Given the context of Fox News' use of the caption 'Manhunt at the Border' it is unlikely a viewer would have understood 'Manhunt at the Border' as referring to a police or law enforcement manhunt. Rather, a viewer more likely perceived 'Manhunt at the Border' as 'rhetorical hyperbole[,]' a 'vigorous epithet' or 'loose and figurative language.' [Citation.]"[6]

## DISCUSSION

### I. *Anti-SLAPP Legal Principles*

The Legislature enacted section 425.16 to deter lawsuits "brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) " ' "Because these meritless lawsuits seek to deplete 'the defendant's energy' and drain 'his or her resources' [citation], the Legislature sought ' "to prevent SLAPPs by ending them early and without great cost to the SLAPP target." ' " ' " (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 312 [46 Cal.Rptr.3d 606, 139 P.3d 2].) To achieve the goal of encouraging participation in matters of public significance, the statute must be construed broadly. (§ 425.16, subd. (a); *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 199 [46 Cal.Rptr.3d 41, 138 P.3d 193].)

---

[6] In reaching these conclusions, the trial court granted Fox News's request to take judicial notice of two exhibits, exhibit 11 (not guilty verdicts in Monti's trial) and exhibit 12 (dictionary definitions of the word "manhunt"), but denied Fox News's request to take judicial notice of the remainder of its exhibits. The court also denied plaintiffs' request for judicial notice of the facts alleged in the complaint. Plaintiffs do not challenge these rulings.

In ruling on a defendant's anti-SLAPP motion, the trial court engages in a two-step analysis. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703].) First, the court determines "whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." (*Ibid.*) Second, if the court finds this showing has been made, it must dismiss the cause of action unless the plaintiff meets its burden to demonstrate a probability of prevailing on the claim. (*Ibid.*) On appeal, we conduct a de novo review of these issues. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 [46 Cal.Rptr.3d 638, 139 P.3d 30].) We thus review the trial court's ruling and not its rationale. (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 80 [24 Cal.Rptr.3d 72].)

## II. *Probability of Prevailing*

The parties agree plaintiffs' defamation claim arises from acts in furtherance of Fox News's free speech rights and therefore plaintiffs' complaint is subject to the anti-SLAPP statute. Thus, the legal issue here is whether plaintiffs met their burden to show a "probability" they will "prevail" on the defamation claim. (§ 425.16, subd. (b)(1).)

### A. *Legal Standards*

■ To meet their burden to show a probability of prevailing, plaintiffs were required to present evidence to demonstrate that their defamation claim was " ' "supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted . . . was credited." ' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 713–714 [54 Cal.Rptr.3d 775, 151 P.3d 1185]; see *Zamos v. Stroud* (2004) 32 Cal.4th 958, 965 [12 Cal.Rptr.3d 54, 87 P.3d 802].) In deciding the potential merit issue, the trial court considers the parties' pleadings and admissible evidentiary submissions. (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733].) The court does not weigh the credibility or compare the strength of competing evidence, but merely determines if there is sufficient evidence to show plaintiffs can satisfy each element of their claim. (*Ibid.*)

### B. *Plaintiffs Did Not Meet Burden to Support Defamation Claim*

In their complaint, plaintiffs based their defamation claim against Fox News on various alleged false statements made during the broadcast. But in opposing the anti-SLAPP motion, plaintiffs clarified that the sole factual basis for their defamation claim against Fox News was the assertion that law enforcement was conducting an organized search for plaintiffs (a " 'Manhunt

at the Border' "). To show the falsity of this statement, plaintiffs relied on evidence that the police were merely investigating the November 18 incident and had arrested only one of the plaintiffs and then released him after questioning.

Based on these limited factual allegations, plaintiffs contend the trial court erred in concluding that Fox News's alleged defamatory statements were privileged as a "fair and true report" under Civil Code section 47, subdivision (d)(1).

■ Civil Code section 47, subdivision (d)(1) makes privileged "a fair and true report in, or a communication to, a public journal, of [a] public official proceeding, or . . . anything said in the course thereof." A "public official proceeding" includes a police investigation. (*Howard v. Oakland Tribune* (1988) 199 Cal.App.3d 1124, 1128 [245 Cal.Rptr. 449].) Thus, an article or broadcast about statements made in the context of a police investigation is privileged and cannot support a defamation claim. (*Ibid.*) The privilege applies if the substance of the publication or broadcast captures the gist or sting of the statements made in the official proceedings. (See *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 351 [37 Cal.Rptr.3d 480].)

Plaintiffs argue that this privilege is inapplicable here because there was no evidence of any statements made in the police reports or in any other official proceeding that the police were conducting a "manhunt." We need not reach the merits of this argument because plaintiffs' burden in opposing an anti-SLAPP motion was to substantiate *each* element of their cause of action, and not merely to counter defendant's affirmative defenses. One essential element of plaintiffs' defamation claim (as limited in their anti-SLAPP motion papers) was to establish that Fox News did in fact make the statement alleged to be false—*that law enforcement officials were conducting a "manhunt" for plaintiffs*. As both parties recognize, Fox News never expressly stated that *law enforcement officials* were conducting a manhunt for plaintiffs. Plaintiffs argue, however, that this statement can be reasonably implied from the "MANHUNT AT THE BORDER" caption.

■ To evaluate this contention, we employ settled legal principles of defamation law. In determining whether a publication has a defamatory meaning, the courts apply a totality of the circumstances test to review the meaning of the language in context and whether it is susceptible of a meaning alleged by the plaintiff. (See *Monterey Plaza Hotel v. Hotel Employees & Restaurant Employees* (1999) 69 Cal.App.4th 1057, 1064–1065 [82 Cal.Rptr.2d 10] (*Monterey Plaza Hotel*); *Morningstar, Inc. v. Superior Court* (1994) 23 Cal.App.4th 676, 686–694 [29 Cal.Rptr.2d 547]; see also *Moyer v. Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720,

724–725 [275 Cal.Rptr. 494].) "[A] defamatory meaning must be found, if at all, in a reading of the publication as a whole." (*Kaelin v. Globe Communications Corp.* (9th Cir. 1998) 162 F.3d 1036, 1040 (*Kaelin*).) "This is a rule of reason. Defamation actions cannot be based on snippets taken out of context." (*Ibid.*; see *Greenbelt Pub. Assn. v. Bresler* (1970) 398 U.S. 6, 13–14 [26 L.Ed.2d 6, 90 S.Ct. 1537] [when viewed in context of the entire article, no reasonable reader would interpret the word "blackmail" to mean that the plaintiff had committed the crime of blackmail]; *Lambert v. Providence Journal Company* (1st Cir. 1975) 508 F.2d 656, 658–659.)

However, "not every word of an allegedly defamatory publication has to be false and defamatory to sustain a libel action. . . . '[T]he test of libel is not quantitative; a single sentence may be the basis for an action in libel even though buried in a much longer text . . . .' " (*Kaelin, supra,* 162 F.3d at p. 1040, citation omitted.) "The defamatory character of language is measured 'according to the sense and meaning . . . which such language may fairly be presumed to have conveyed to those to whom it was published.' " (*Savage v. Pacific Gas & Electric Co.* (1993) 21 Cal.App.4th 434, 447 [26 Cal.Rptr.2d 305].) "In determining whether statements are of a defamatory nature, and therefore actionable, ' "a court is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language of the complaint for libelous publication according to its natural and popular construction." ' " (*Morningstar, Inc. v. Superior Court, supra,* 23 Cal.App.4th at p. 688.)

■ In reviewing an alleged defamatory meaning, " 'the context in which the statement was made must be considered . . . . [¶] This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed. [Citation.] " '[T]he publication in question must be considered in its entirety; "[i]t may not be divided into segments and each portion treated as a separate unit." [Citation.] It must be read as a whole in order to understand its import and the effect which it was calculated to have on the reader [citations], and construed in the light of the whole scope [of the publication]. [Citation.]' " ' " (*Monterey Plaza Hotel, supra,* 69 Cal.App.4th at pp. 1064–1065.)

Thus, when the alleged defamatory statement is contained in a headline, the headline must be read in conjunction with the entire article, and when so read the conclusion and inferences alleged by the plaintiff must be supported. (*Morningstar, Inc. v. Superior Court, supra,* 23 Cal.App.4th at p. 692; *Selleck v. Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1132–1133 [212 Cal.Rptr. 838] [court must examine newspaper's headlines, caption and article as a whole to determine whether it is "reasonably susceptible of a

defamatory meaning"]; *Moyer v. Amador Valley J. Union High School Dist.,
supra,* 225 Cal.App.3d at p. 726 [despite headline, article read in full context
accurately reported the facts]; *Byrd v. Hustler Magazine, Inc.* (Fla.Dist.Ct.App.
1983) 433 So.2d 593, 595; *Hylsky v. Globe Democrat Pub. Co.* (1941) 348
Mo. 83 [152 S.W.2d 119, 121–123].)

Likewise, when the alleged false statement is contained in a television
broadcast, the court must examine the statement in context with the remain-
der of the news report to determine if it has the meaning attributed to it by
the plaintiff. (See *Monterey Plaza Hotel, supra,* 69 Cal.App.4th at p. 1065;
see also *Ramsey v. Fox News Network* (D.Colo. 2005) 351 F.Supp.2d 1145,
1151; *Lal v. CBS, Inc.* (E.D.Pa. 1982) 551 F.Supp. 356, 361 ["[t]he error in
[plaintiff's] argument lies in plaintiff's failure to consider [the alleged false]
statement in context with the remainder of the news report"]; *Harrison v.
Washington Post Co.* (D.C. 1978) 391 A.2d 781, 783–784 ["no reasonable
person who viewed and heard the broadcast could have received [the alleged
false] impression"].) "To determine defamation, the Court must view the
broadcast as a whole rather than dwell upon specific parts of the broadcast.
The Court must give each part its proper weight and the entire broadcast the
meaning that people of average intelligence and understanding would give it.
[Citations.]" (*Ramsey, supra,* 351 F.Supp.2d at p. 1151.)

Under these principles, the fact that a statement "[s]tanding alone" could
be construed as false is not sufficient to support a defamation claim. (*Monterey
Plaza Hotel, supra,* 69 Cal.App.4th at p. 1065.) Instead, the court must
consider the alleged false statement in "the context of the entire broadcast."
(*Ibid.*) An alleged defamatory statement is actionable only if the statement,
"considered within the context of the entire broadcast," could be reasonably
interpreted in the manner alleged by the plaintiff. (*Ibid.*) If no reasonable
viewer could have reasonably understood the statement in the alleged defa-
matory sense, the matter may be decided as a question of law. (*Id.* at
pp. 1064–1066.)

Applying these principles here, we conclude that a person who viewed the
Fox News broadcast would not have reasonably concluded that law enforce-
ment officers were conducting a "manhunt" for plaintiffs. Instead, viewed in
context, the manhunt caption was an attention-grabbing or colorful way of
referring to Monti's own attempts to bring to justice the alleged perpetrators
of the attack against him.

The caption "MANHUNT AT THE BORDER" appeared throughout the
telecast. The report begins with Colmes stating that the police are *"investigat-
ing"* an attack on an anti-illegal immigration advocate (Monti), and then
showing photographs taken by Monti of "his alleged attackers." Monti then

gave his detailed version of the incident. Plaintiffs do not claim that these statements were the basis of their defamatory action. One of the newscasters then interrupted by explaining the police version of the incident, i.e., that Monti had "sparked" the behavior of the day laborers because Monti was taking photographs of the men. Monti responded by arguing that the police were not doing enough to respond to the incident: "[W]hat I think the real hate crime here . . . is how the San Diego Police Department is you know responding to this crime. I mean, if it had been eight white guys attacking a migrant, I think they would have already tried and convicted . . . the people in the court of public opinion. And, you know, we would have heard of all this sanctimonious rhetoric already about how this could never happen again . . . ." Monti then spoke at length about his views of the larger social problems arising from the migrant encampments.

On our review of this telecast, it is not reasonably probable that a viewer would conclude that the manhunt caption was characterizing the actions of law enforcement officials. Instead, the only reasonable conclusion is that the caption refers to *Monti's* own search for plaintiffs and his belief that they should be charged with an assault crime.

Plaintiffs argue that although it is possible the "average television viewer, or average juror . . . [could] glean from the broadcast that the manhunt was by Monti, not the police . . . ," the issue presents a question of fact for the jury. Plaintiffs emphasize that when the television viewer saw the "MAN-HUNT AT THE BORDER" caption in conjunction with the "wanted" poster containing plaintiffs' photographs, it would be reasonable for the viewer to conclude that "the police [were] actively searching the U.S./Mexico border for the[se] men" who "were wanted by the police for crimes and were fugitives from the law."

Although this argument may be persuasive when viewing the caption with the photographs in isolation, that is not how the story was presented. The story was not a single photograph; rather it was a four-minute telecast of many different images and concepts. The audio did not contain any sugges-tion that the police were conducting an organized search for these men at the border. In fact, the newscasters said just the opposite: that the police officers were *investigating* the incident and the police lieutenant did not necessarily agree with Monti's version of the events. As plaintiffs have repeatedly argued in this case, an "investigation" is very different from a "manhunt." Moreover, because the caption appeared on the screen during the entire time of the broadcast, the fact that it was shown while the photographs were displayed did not have a special meaning. Used in this way, a reasonable viewer would understand the caption's purpose was to highlight and draw attention to the story, rather than as a vehicle for communicating an objective fact that was

not consistent with the verbal portion of the story. The caption remained on the screen despite the fact that most of the story did not even concern the alleged attack on Monti or the suspects, and instead involved the larger social problems arising from "migrant camps."

In this respect, plaintiffs' reliance on *McNair v. Hearst Corporation* (9th Cir. 1974) 494 F.2d 1309 is misplaced. In *McNair*, a newspaper published an article in which the headline and the first two paragraphs could have been interpreted as stating that the plaintiff (an attorney) received an unreasonable amount of fees to represent a woman in a divorce case, and that, as a result of these high fees, the plaintiff now owned the client's home. (*Id.* at pp. 1310–1311.) However, if a reader had read the lengthy article to its conclusion, the reader would understand that the client's loss of her home was a result of her former husband's failure to meet his financial obligations. (*Ibid.*) The lower court granted summary judgment in favor of the newspaper, on the basis that "the article read in its entirety was actually true." (*Id.* at p. 1311.) The Ninth Circuit reversed, concluding that it was a jury question whether the entire article "eliminated the impact of any false impression created at the outset." (*Ibid.*) The court emphasized that to understand the true story, a reader would be required to read the entire story, which consisted of "about fifty more paragraphs . . . on three different pages of the newspaper." (*Id.* at p. 1310.)

Similarly, in *Kaelin, supra,* 162 F.3d 1036, the court stated that a headline in the National Examiner could be reasonably interpreted as stating that police officers believe that Kato Kaelin committed the murders of Nicole Brown Simpson and Ronald Goldman. (*Id.* at pp. 1037, 1039–1040.) However, the court assumed a person who read the article would understand the true facts—that the police officers believed that Kaelin committed perjury (and not murder). (*Id.* at pp. 1037–1039.) Despite this, the court found the headline could be the basis of a libel claim, emphasizing the article was "located 17 pages away from the cover. In this respect, the National Examiner's front page headline is unlike a conventional headline that immediately precedes a newspaper story, and nowhere does the cover headline reference the internal page where readers could locate the article. A reasonable juror could conclude that the Kaelin article was too far removed from the cover headline to have the . . . effect" of "clear[ing] up any false and defamatory meaning that could be found on the cover." (*Id.* at p. 1041.) The court noted that although a "headline[] alone may be enough to make libelous per se an otherwise innocuous article," the test is that the alleged defamation "must be judged by the publication as a whole." (*Ibid.*, italics omitted.)

In this case, unlike *McNair* and *Kaelin*, the caption cannot be reasonably viewed apart from the rest of the story because a viewer who saw the caption

also necessarily heard the story. Even if the caption, when read in isolation, could be interpreted to mean that law enforcement was conducting an intensive search for fugitives, it would be unreasonable for a person to watch and listen to the broadcast and believe that the police were out hunting for plaintiffs. Instead, at most Monti was looking for his alleged attackers and wanted the police to do more. Although the use of the phrase "Manhunt at the Border" to characterize what Monti was doing may have been an exaggerated way of characterizing his actions, plaintiffs did not allege in their complaint, nor did they argue in response to the anti-SLAPP motion, that a statement that Monti was conducting a "manhunt" for them was defamatory. Moreover, the use of hyperbole or language " ' " 'in a loose, figurative sense' " ' " is constitutionally protected and not actionable. (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 27 [53 Cal.Rptr.3d 752].)

To the extent that plaintiffs argue Fox News waived the argument as to the meaning of the "MANHUNT AT THE BORDER" caption by agreeing not to assert a "truth" defense, we find this contention without merit. For purposes of the anti-SLAPP motion, Fox News agreed not to rely on the truth defense *with respect to the statement alleged to be false.* The only statement alleged to be false was the statement that police officers were conducting an extensive organized search (a "manhunt") for plaintiffs. Fox News agreed it would not assert that the alleged statement was true, i.e., that law enforcement officials *were* conducting a "manhunt" for plaintiffs. This is very different from conceding (for purposes of the motion) that the "MANHUNT AT THE BORDER" caption could be interpreted by a reasonable viewer to mean that police were conducting a manhunt. To establish a defamation in this case, plaintiffs had the burden of making a predicate showing the caption meant that police officials were conducting a manhunt for plaintiffs.

### III. *Conclusion*

A defamation claim fails as a matter of law if the publication " ' "is not reasonably susceptible of a defamatory meaning and cannot be reasonably understood in the defamatory sense pleaded" ' " by the plaintiffs. (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 261 [228 Cal.Rptr. 206, 721 P.2d 87].) We determine there is an insufficient basis for a fact finder to conclude that the "MANHUNT AT THE BORDER" caption, when viewed in context with the entire story, was reasonably susceptible of the false and defamatory meaning attributed to it by plaintiffs. We thus hold the court properly granted Fox News's anti-SLAPP motion.

In reaching this conclusion, we emphasize that an owner of a cable television news program has broad First Amendment rights to present information in the manner it chooses. The use of captions and graphics has

become a popular method for television stations to enhance their news programs and thus to increase viewer audiences. In this case, plaintiffs seek to isolate a four-word caption from the rest of the story to create a legal basis for their defamation claim. If we were to uphold this approach, it is likely the courts would be faced with a plethora of new claims from viewers dissatisfied with how a particular television caption or graphic has accurately summarized or represented the essence of the news story. This outcome would have a severe chilling effect on free speech rights and would be contrary to First Amendment jurisprudence, as well as common sense. As in this case, the best way to challenge a claimed false statement is to allow the dissatisfied viewer to exercise his or her own First Amendment rights to counter the claimed false statement. Although the Fox News telecast may not have been " 'fair and balanced,' " it did not have the defamatory meaning alleged by plaintiffs and thus is not actionable. (*Ramsey v. Fox News Network, supra,* 351 F.Supp.2d at p. 1154.)

## DISPOSITION

Judgment affirmed. Appellants to pay respondent's costs on appeal.

McConnell, P. J., concurred.

**AARON, J.,** Dissenting.—

### *Introduction*

"MANHUNT AT THE BORDER" is blazoned across the bottom of the television screen. A "Wanted" poster displaying photographs of plaintiffs is shown. The caption on the poster says: "Wanted [—] Robbery, Assault and Battery." In introducing the segment, Alan Colmes, one of the two anchors of the telecast, states, "The San Diego Police are investigating an attack on an anti-illegal immigration advocate [John Monti] near a migrants' encampment close to the San Diego/Mexico border."

In spite of these facts, the majority reaches the remarkable conclusion that *no reasonable person* viewing this telecast would have concluded that plaintiffs were the subjects of a manhunt being conducted by law enforcement officers. (Maj. opn., *ante,* at p. 1339.) Further, notwithstanding the absence of any other express or implied reference to a manhunt throughout the remainder of the telecast, the majority concludes, "[T]he only reasonable conclusion is that the caption ['MANHUNT AT THE BORDER'] refers to *Monti's* own search for plaintiffs and his belief that they should be charged with an assault crime." (Maj. opn., *ante,* at p. 1340.)

The majority's conclusion is based on the notion that any reasonable viewer of the telecast would interpret the word "manhunt" in a manner that is inconsistent with any known definition of the term, and inconsonant with the context in which the term is used in the telecast. Because I cannot agree with the majority's reasoning or its conclusions, I dissent.[1]

### A Reasonable Person Could Conclude That Fox News Made the Statements Alleged, and That the Statements Imply a False Factual Assertion

Plaintiffs' claim is, in essence, that Fox News defamed them by implying, through the publication of the "Wanted" poster and the display of the "MANHUNT AT THE BORDER" caption, that plaintiffs were criminal fugitives who were wanted for the crimes of robbery and assault and battery, and that they were the subjects of an ongoing police manhunt. Fox News's primary argument on appeal is that "the segment suggests not a law enforcement search, but a search by Monti and the Minutemen."

At the outset of its analysis, the majority correctly states, "An alleged defamatory statement is actionable only if the statement, 'considered within the context of the entire broadcast,' could be reasonably interpreted in the manner alleged by the plaintiff," and that, "[i]f no reasonable viewer could have reasonably understood the statement in the alleged defamatory sense, the matter may be decided as a question of law." (Maj. opn., *ante*, at p. 1339.) The majority continues, "Applying these principles here, we conclude that a person who viewed the Fox News broadcast would not have reasonably concluded that law enforcement officers were conducting a 'manhunt' for plaintiffs. Instead, viewed in context, the manhunt caption was an attention-grabbing or colorful way of referring to Monti's own attempts to bring to justice the alleged perpetrators of the attack against him." (Maj. opn., *ante*, at p. 1339.)[2]

---

[1] I have considered Fox News's alternative arguments for affirming the judgment, namely that the manhunt caption was privileged as a "fair and true report" (Civ. Code, § 47, subd. (d)(1)) of the police investigation into the alleged attack, or that the caption constituted fair comment, or a rational interpretation of ambiguous facts, and have rejected them. However, I have restricted my analysis in this dissent to the majority's conclusion that no reasonable viewer of the telecast could have interpreted the telecast as falsely implying the existence of a law enforcement manhunt for plaintiffs, and its suggestion that the "MANHUNT" caption constitutes mere hyperbole.

[2] The majority maintains that the "Manhunt" caption was merely "an attention-grabbing or colorful way" of referring to Monti's own search for plaintiffs (maj. opn., *ante*, at p. 1339), and suggests, with no analysis, that the caption constitutes "hyperbole," which is "constitutionally protected and not actionable." (Maj. opn., *ante*, at p. 1342.)

The hallmark of protected rhetorical hyperbole is that it does not imply a provably false factual assertion. (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1048 [72

The majority's assertion that the "MANHUNT" caption could not reasonably be interpreted as suggesting a manhunt for plaintiffs by law enforcement authorities, and its assertion that the *only* reasonable interpretation of the caption is that it referred to a search for plaintiffs conducted by Monti, alone, is baseless.[3] To begin with, this assertion is belied by the plain meaning of the word "manhunt" as reflected in the definitions of the term "manhunt" that Fox News, itself, offered in support of its anti-SLAPP motion, and which the majority cites in its opinion. Those definitions include the following: "[A]n organized search for a person especially a criminal: The police have launched a manhunt after the body of a six-year old boy was found last night"; "A search for one man, involving many searchers, normally for a criminal. After he did a runner, there was a full scale manhunt on to catch the murderer"; "[A]n organized intensive search, usu[ally] for a fugitive or fugitives from the law"; "An organized, extensive search for a person, usually a fugitive criminal"; "An organized search for a person, esp[ecially] a criminal"; and "[A]n intensive and usually large-scale organized search for someone, especially a criminal or fugitive."

Contrary to the majority's claim, is it abundantly clear that the word "manhunt" implies a search conducted by a large number of people. All of the above definitions suggest a large scale search for a criminal fugitive—i.e. a person "wanted" by law enforcement authorities in connection with the commission of a crime. Several of the examples of the use of the word "manhunt" that accompany the definitions either expressly or impliedly refer to a *police* manhunt. None of the definitions imply a search conducted by an individual, and the majority does not cite a single example of the use of the word "manhunt" to refer to a search conducted by an individual, acting alone.

Not surprisingly in view of these definitions, California courts have routinely used the term "manhunt" to refer to a search conducted by law

---

Cal.Rptr.3d 210].) "[S]tatements 'that cannot "reasonably [be] interpreted as stating actual facts" about an individual' are . . . constitutionally protected." (*Lam v. Ngo* (2001) 91 Cal.App.4th 832, 849 [111 Cal.Rptr.2d 582], quoting *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 20 [111 L.Ed.2d 1, 110 S.Ct. 2695].) Specifically, " ' "rhetorical hyperbole" ' " or " 'loose, figurative, or hyperbolic language' which would 'negate the impression that the writer was seriously maintaining' a proposition that was 'sufficiently factual to be susceptible of being proved true or false' is protected." (*Lam, supra,* 91 Cal.App.4th at p. 849, quoting *Milkovich, supra,* 497 U.S. at pp. 20–21.) The suggestion that Fox News was not seriously maintaining that there was in fact an ongoing manhunt for plaintiffs is completely implausible. Further, whether there was or was not an ongoing manhunt for plaintiffs is clearly a proposition that is susceptible of being proven true or false. Thus, contrary to the majority's implication, the "MANHUNT" caption clearly does not constitute mere hyperbole.

[3] Not even Fox News makes this claim. Rather, as noted above, Fox News maintains that the "MANHUNT" caption referred to a manhunt being conducted by "Monti *and the Minutemen.*" (Italics added.) However, the majority omits any mention of the Minutemen being participants in the manhunt, apparently because, despite Fox News's assertion, the telecast in fact contains no mention whatsoever of the Minutemen.

enforcement officers. (See, e.g., *People v. Cruz* (2008) 44 Cal.4th 636, 649 [80 Cal.Rptr.3d 126, 187 P.3d 970] ["After a massive manhunt lasting nearly a week, defendant and Estrada surrendered and were taken into custody at the rice mill where defendant and his brother were employed."]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1378 [58 Cal.Rptr.3d 368, 157 P.3d 973] ["The Sacramento County Sheriff's Department mounted a massive manhunt for the killer, interviewing hundreds of people."].) As far as I am able to determine, the term "manhunt" has *never* been used in any published opinion by a California court to refer to a search conducted by an individual acting on his own, and the majority has not offered even a *single* instance in which the term has been used in such an unorthodox fashion in *any* source, be it a newspaper article, a television broadcast, or even a detective novel.

With respect to the majority's assertion that the context in which Fox News used the "MANHUNT" caption makes it clear that the term referred only to Monti's own quest to locate plaintiffs, apart from introducing the segment by referring to a *police* investigation, showing a "Wanted" poster (with no indication that Monti, and not the police, had prepared the poster), and presenting the caption, "MANHUNT AT THE BORDER" throughout the entire telecast, there is no other reference in the telecast to a search for plaintiffs. Thus, contrary to the majority's suggestion, there is nothing about the context in which the caption was presented that would lead *any* reasonable person to conclude that the "MANHUNT" caption did not refer to a police manhunt, but rather, to a search for plaintiffs conducted by Monti alone.

The majority's contention that rather than communicating to viewers that police were conducting a manhunt for plaintiffs, the "newscasters said just the *opposite*" (maj. opn., *ante*, at p. 1340, italics added), is particularly unpersuasive. In support of this contention, the majority notes that the newscasters informed viewers that the police were *investigating* the incident. The basis for the majority's assertion that a police investigation is "the opposite" of a manhunt is, at best, unclear. (Maj. opn., *ante*, at p. 1340.) Law enforcement officers conduct manhunts *in furtherance* of investigations. (See, e.g., *State v. Parker* (2008) 381 S.C. 68 [671 S.E.2d 619, 621] ["Multiple agencies participated in the investigation and manhunt including the highway patrol, the South Carolina Law Enforcement Division, the Colleton County Sheriff's Department, and the Department of Alcohol, Tobacco and Firearms."]; *Smith v. U.S.* (E.D.Tex., Mar. 12, 2007, No. 1:03-CV-1058) 2007 WL 781449, p. *1 ["After an exhaustive manhunt and investigation, including patrol officers, police dogs, detectives, and FBI agents, Smith, Stephens, and Tatum were arrested and indicted."]; *Kinge v. State* (N.Y.Ct.Cl. 2007) 20 Misc.3d 161 [859 N.Y.S.2d 323, 326] ["A massive manhunt immediately ensued with more than 50 investigators eventually assigned to this investigation."].) The fact that the

telecast informed viewers that police were investigating the incident in no way makes it clear that police were *not* conducting a manhunt for plaintiffs.

It is clear to me that a reasonable viewer could have understood the words "MANHUNT AT THE BORDER" in Fox News's telecast to refer to a law enforcement manhunt. In fact, this interpretation is by far the most reasonable interpretation of the caption, and the one that I personally hold after having viewed the segment. The majority's conclusion that plaintiffs have failed to make a prima facie showing that Fox News made a defamatory statement because, *as a matter of law*, no reasonable person could conclude that the telecast implied that plaintiffs were wanted by police for the crimes of robbery and assault and battery and were the subjects of a law enforcement manhunt, is, in my view, untenable.

A petition for a rehearing was denied June 9, 2009, and appellants' petition for review by the Supreme Court was denied August 26, 2009, S174134. Werdegar, J., was of the opinion that the petition should be granted.